UNITED STATES of America,
Plaintiff–Appellee,

v.

Rex HENLEY, Rafael Bustamante,
Willie McGowan, and Garey West,
Defendants–Appellants.

Nos. 96–50697, 97–50015, 97–50020 and 97–50060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 2000

Filed Feb. 7, 2001

Karen L. Landau, Oakland, California, Carol A. Klauschie, Pasadena California, Gail Ivens, Glendale, California, and Mary Ellen Lewis, San Luis Obispo, California, for the defendants-appellants.

John C. Rayburn, Jr., Assistant United States Attorney, and Nancy Spiegel, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

Before: FERGUSON, BOOCHEVER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Rex Henley, Rafael Bustamante, Willie McGowan, and Garey West appeal their

**1112**

convictions for conspiracy to possess and distribute twelve kilograms of cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). They also appeal the denial of their motion for a new trial based on allegations of juror bias and tampering. We remand to the district court for further proceedings regarding the new trial motion. We reject appellants' other grounds for appeal in a memorandum disposition filed concurrently with this opinion.

## I. Background

On June 23, 1994, a federal grand jury returned an indictment charging all four appellants, as well as Darryl Henley, Tracy Donaho, and Alejandro Cuevas, with conspiracy to distribute cocaine and possession with intent to distribute cocaine.[1] The underlying conspiracy revolved around Darryl Henley, a professional football player for the Los Angeles Rams[2] and the nephew of appellant Rex Henley. Appellant Bustamante supplied cocaine to Darryl Henley who, with the assistance of appellants West and McGowan, sought to distribute it in Memphis and Atlanta. Appellant Rex Henley helped prepare and conceal cocaine for transport and accompanied the couriers on some trips. Tracy Donaho, a Rams cheerleader who was romantically involved with Darryl Henley, served as a drug courier.

On July 15, 1993, Donaho was arrested at the Atlanta International Airport after agents from the Drug Enforcement Agency ("DEA") discovered twelve kilograms of cocaine in her bag. Soon thereafter, she agreed to cooperate with the DEA's investigation. At the subsequent trial, she provided testimony against all of the defendants.

On March 28, 1995, the appellants, along with Darryl Henley, were convicted on every count. One month later, juror Bryan Quihuis contacted the court and reported that he had been the subject of a bribery attempt orchestrated by Darryl Henley and former juror Michael Malachowski. The parties were notified of the allegation and, on May 8, 1995, the appellants joined in a motion for a new trial, claiming that juror misconduct had deprived them of a fair trial. During several months of subsequent investigation, the following information came to light:

Former juror Michael Malachowski, who had been excused from the jury during trial for reasons unrelated to the misconduct at issue here, paid an unsolicited visit to the home of Darryl and Rex Henley on March 20, 1995, while the trial was still in progress. He told the Henleys that they should contact him in the event that they were convicted, because he had information that might entitle them to a new trial. Specifically, Malachowski informed the Henleys that he had carpooled with two other jurors, Bryan Quihuis and Sean O'Reilly, and that the three jurors had discussed the evidence in violation of the court's instructions.

The following day, Darryl Henley contacted Malachowski and asked whether Malachowski knew any sitting juror who might be willing to vote not guilty on the charges against both of the Henleys.[3] Malachowski informed Henley that juror Quihuis had confessed to using methamphetamine on the weekends and that juror O'Reilly had made racist remarks. Henley instructed Malachowski to approach Quihuis and to "do anything it takes" to secure a not guilty vote. In exchange, Hen-

**1.** The indictment also charged some of the defendants with conspiracy to extort money from Darryl Henley, but those charges were severed and later dropped. Donaho and Cuevas pleaded guilty in exchange for their testimony against the remaining defendants. Darryl Henley is not a party to this appeal.

**2.** Now the St. Louis Rams.

**3.** Through the remainder of this Background section, when we use the name "Henley" without a first name, our reference is to Darryl Henley, who had all of the contacts with Malachowski and Quihuis following Malachowski's March 20 visit to the Henleys' home.

ley promised Malachowski a job with the Rams.

On the evening of March 21, Malachowski visited Bryan Quihuis at his home and asked Quihuis what he would want as payment for a not guilty vote. Quihuis professed shock and searched Malachowski for a recording device; only then did the two discuss money, settling conditionally on a figure of $25,000 to $50,000. Quihuis insisted on speaking directly to Henley. Malachowski and Quihuis then drove to a pay phone and placed a call to the Ram football player. Quihuis and Henley discussed the bribe, and Quihuis indicated that he wished to be paid half the money in advance.

Quihuis told Malachowski that he had tentatively decided to accept Henley's offer, but that he would like to consider the matter further and would contact Malachowski with his final answer. Quihuis had second thoughts soon thereafter. He called Malachowski later that night and informed him that he would not participate in the scheme.

Over the course of the next few days, as the jury entered deliberations, numerous efforts were made to persuade Quihuis to reconsider. Several phone calls were placed from Henley's cellular phone to Quihuis, but the two apparently did not speak again. Malachowski made frequent phone calls to Quihuis and even drove to Quihuis's home in an attempt to speak to him; Quihuis ultimately instructed his parents to tell Malachowski that he wasn't home. On Friday, March 24, two days after deliberations began, Quihuis informed the trial judge that he had seen a newspaper article about the case and had learned that Henley was facing a possible life sentence if convicted. Quihuis reported that the article had made a "big impact" on him and that he had had difficulty sleeping. After questioning Quihuis, the court determined that he need not be disqualified on account of his exposure to the article.

On Monday, March 27—the day before the jury returned its verdicts—Malachow-

ski spoke to Quihuis and relayed Henley's concern that Quihuis was attempting to get himself excused from the jury. Malachowski made clear that Henley would pay $50,000 for a vote of not guilty. Quihuis once again declined the offer. The jury returned guilty verdicts against the defendants the next day.

Following the convictions, Malachowski provided a deposition to Rex Henley's counsel in which he swore—falsely, it seems—that Quihuis, not Malachowski, had initiated the bribery scheme and that Quihuis had attempted to extort money from Henley in exchange for a not guilty vote. Malachowski also alleged that juror Sean O'Reilly had made several racist remarks while carpooling to and from the trial, including the statement "All the niggers should hang." Finally, Malachowski reported that Quihuis had used drugs during the trial and that Malachowski, Quihuis, and O'Reilly had engaged in premature deliberations by discussing the evidence prior to the jury's deliberations.

After the allegations of misconduct had come to light, and after several months of investigation by the FBI, the district court conducted evidentiary hearings on the motions for a new trial. Malachowski and O'Reilly testified at the hearings, but Quihuis asserted his Fifth Amendment privilege against self-incrimination and refused to testify. The parties stipulated, however, that the transcripts of Quihuis's conversations with the court clerk, the FBI, and a defense investigator would be admitted into evidence.

The evidence pertaining to O'Reilly's alleged racist remarks was contradictory. Malachowski testified that he had embellished O'Reilly's statements and that, although O'Reilly had indeed used the word "nigger," he had not used it in reference to any of the defendants on trial. O'Reilly denied having made any racist statements and claimed to have dated an African–American woman in the past and to have befriended an African–American juror during the trial. Quihuis, however, provided a different account in his interviews with the

FBI and the defense investigator. One of the FBI's reports recounts Quihuis's acknowledgment that at some point during the trial, "while either carpooling to or from the trial, O'Reilly stated, 'The niggers are guilty,' or 'Niggers are guilty.'" According to the report, Quihuis was unsure whether O'Reilly was referring to the defendants or to African–Americans in general. When asked by the defense investigator whether O'Reilly was likely to have been lying when he denied being racially biased in his juror questionnaire, Quihuis responded, "I would imagine so."

On August 29, 1996, the district court denied the motion for a new trial in a written order. The court held that the allegations of impropriety during trial—including the allegations of O'Reilly's racial prejudice—could not entitle the appellants to a new trial because Federal Rule of Evidence 606(b) barred virtually all juror testimony offered to impeach a jury's verdict.[4] The court considered the allegations of O'Reilly's racial bias solely to the extent that they might reveal untruthful answers during voir dire. The court observed that prospective jurors were asked three race-related questions in their questionnaires: what their overall views were of interracial dating, whether they had ever had a bad experience with a person of a different race, and whether race would influence their decisions in any way.[5] Without making any specific findings about the contents of O'Reilly's alleged racist remarks, the court stated: "[T]he court does not find

that juror O'Reilly failed to answer honestly."

In considering the implications of the attempted bribe of Quihuis, the court acknowledged that such tampering with a sitting juror was presumptively prejudicial. However, citing our decision in *Hughes v. Borg*, 898 F.2d 695 (9th Cir.1990), the court found that the presumption of prejudice could be rebutted by a showing that "the judgment was not substantially swayed by the error." *Id.* at 701. In the present case, the court found that the presumption of prejudice had been rebutted by "overwhelming" evidence of the defendants' guilt, as demonstrated by the jury's "speedy" verdict.[6]

The court further found, by a preponderance of the evidence, that Rex Henley had been aware of the bribery attempt before the verdict was rendered. Consequently, the court denied his motion for a new trial based on the jury tampering allegations as untimely under Federal Rule of Criminal Procedure 33, which requires new trial motions to be made within seven days after the verdict unless they are based on newly discovered evidence.

All four appellants timely appealed the district court's denial of their motion for a new trial.[7]

## II. Analysis

### A. *The Bribery Attempt*

The Supreme Court announced the standard governing allegations of jury tamper-

---

**4.** Rule 606(b) states: "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would

be precluded from testifying be received for these purposes."

**5.** O'Reilly answered that his overall view of interracial dating was "neutral," that he had never had a bad experience with a person of a different race, and that race would not influence his decision in any way.

**6.** The jury's deliberations lasted approximately three days.

**7.** We set forth the facts only with respect to the two issues we discuss below. We find the other grounds for the new trial motion to be without merit.

ing in *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) ("*Remmer I* "). In that case, a juror had been approached during the trial by a man who suggested that the juror "could profit by bringing in a verdict favorable to the petitioner." *Id.* at 228, 74 S.Ct. 450. The Court held that "[a]ny private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.* at 229, 74 S.Ct. 450. The Court remanded the case to the district court for a hearing to determine whether the alleged· contact had been harmless to the petitioner.

On remand, the district court concluded that the petitioner had not been prejudiced by the bribery attempt. The Court again granted certiorari and again reversed, finding that the bribery attempt might have affected the juror's "freedom of action" and had clearly left him "a disturbed and troubled man." *Remmer v. United States,* 350 U.S. 377, 381, 76 S.Ct. 425, 100 L.Ed. 435 (1956) ("*Remmer II* "). The Court reaffirmed that "it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Id.* at 382, 76 S.Ct. 425. The Court did not consider the weight of the government's case or indicate in any way whether the evidence of guilt was or was not overwhelming.

Since the *Remmer* cases, it has been clear that jury tampering creates a presumption of prejudice and that the government carries the heavy burden of rebutting that presumption. In *United States v. Dutkel,* 192 F.3d 893 (9th Cir.1999)— decided after the district court's order denying appellants' new trial motion—this court explained that allegations of jury tampering are qualitatively more prejudicial than other kinds of extraneous influ-

ence on the jury's deliberations: "Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct." *Id.* at 894. *Dutkel,* like this appeal, involved allegations that one co-defendant in a joint trial had bribed a juror—in that case, successfully. The co-defendant who arranged the bribe secured a hung jury for himself, but Dutkel was convicted. We held that even though the bribery scheme had· been carried out by and on behalf of Dutkel's co-defendant, the *Remmer* presumption of prejudice applied to Dutkel because the tampering "may have affected the juror in the exercise of his judgment." *Dutkel,* 192 F.3d at 897.

In evaluating allegations of jury tampering, *Dutkel* holds that we must first determine whether a defendant has made a prima facie showing that "the intrusion had such an adverse effect on the deliberations." *Id.* The "adverse effect" standard is a low one: "Unless the district court finds that this showing is entirely frivolous or wholly implausible, it must order a *Remmer* hearing to explore the degree of the intrusion and likely prejudice suffered by the defendant." *Id.* In evaluating such prejudice, the court "need not conclude that the verdict ... would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by the intrusion." *Id.* at 899.

The district court, in rejecting appellants' new trial motion based on the attempted bribery of juror Quihuis, conducted the requisite hearing but applied what *Dutkel* has since made clear is an incorrect legal standard. Rather than examining whether the bribery attempt "interfered with the jury's deliberations by distracting one or more of the jurors," *id.* at 897, the court considered whether the jury was "substantially swayed" by the alleged misconduct. The standard applied by the district court derives from jury misconduct cases that do not involve allegations of

jury tampering, but rather involve more common and less pernicious extraneous influences on jury deliberations. In fact, with the exception of *Remmer*, none of the cases cited by the district court involved jury tampering.[8] *Dutkel* expressly distinguishes the "prosaic kinds of jury misconduct" cases cited by the district court from the "much more serious intrusion" of a bribe or threat. *Dutkel*, 192 F.3d at 895. Accordingly, the court erred in basing its decision on the "overwhelming evidence" of appellants' guilt rather than considering the effect of the bribery attempt on the course of deliberations.

Although, as mentioned earlier, juror Quihuis invoked his Fifth Amendment privilege against self-incrimination and declined to testify at the evidentiary hearing, sufficient evidence of the effect of the attempted bribe on Quihuis was introduced to convince us that the matter should be remanded to the district court for further consideration in light of *Dutkel*. For example, in an interview with defense investigator Jerry Mulligan, Quihuis described the impact of the bribery attempt:

Mulligan: Did you ever go to the judge [to report the bribery attempt]?

Quihuis: No I was scared. I was extremely extremely scared that if I went to the judge something would happen to me or my family.

Mulligan: Why were you scared?

Quihuis: Because what happened with uh earlier in the case so called I believe it was Alex Quevas[9] uh Bustamante wanted Alex Quevas to do something on the stand or else he'd never see his son again. It kind of crossed my mind, freaked me out that maybe if I didn't cooperate maybe if I did do this something would happen to me so I was trying to be quiet and I was in fear that something would happen to me and my family and no way do I wanna go through a government relocation program and never see my family again.

In the same conversation, Quihuis insisted that the bribery attempt had not affected his judgment, but he conceded that "it screwed with me as far as I felt threatened that if I didn't cooperate, something would happen to me or my family because Mike [Malachowski] knew where I lived, and if he's talking to Darryl [Henley], what makes you think he hasn't given my address to Darryl, and like I said reflecting back to Bustamante and Quevas do you ever wanna see your son walk again crossed my mind. That if I don't cooperate, something's gonna happen to me and my family." Quihuis provided essentially the same account when he was interviewed by the FBI after the bribery scheme came to light, as recounted in the FBI's report:

QUIHUIS never told Judge TAYLOR about this incident because he feared that he or his family would be in jeopardy. He learned at the trial that defendant RAFAEL BUSTAMENTE threatened a witness, ALEX QUEVIS [sic], that he would kill his son if QUEVIS did not purger [sic] himself in the trial....

After the verdict, QUIHUIS mentioned [the bribery attempt] to his

---

8. *See United States v. Harber*, 53 F.3d 236 (9th Cir.1995) (case agent's report containing summary of investigation and agent's opinion that defendants were guilty was present in jury room, despite not having been admitted into evidence); *Lawson v. Borg*, 60 F.3d 608 (9th Cir.1995) (one juror conveyed to other jurors information received out of court about defendant's violent reputation); *Jeffries v. Blodgett*, 5 F.3d 1180 (9th Cir.1993) (one juror informed other jurors that defendant was convicted armed robber); *Hughes*, 898 F.2d 695 (police report not admitted into evidence was inadvertently given to jury); *Marino v. Vasquez*, 812 F.2d 499 (9th Cir.1987) (one juror conducted out-of-court experiment with third party and another juror made use of dictionary definition that differed from court's instructions); *United States v. Caro–Quintero*, 769 F.Supp. 1564 (C.D.Cal.1991) (local newspapers were in jury room during deliberations).

9. Co-defendant Alejandro Cuevas.

grandparents. His grandparents asked why he did not tell the judge about this. QUIHUIS explained his fear about he [sic] or his family members being hurt.

■ Under *Dutkel*, the appellants have made a prima facie showing that the intrusion "interfered with the jury's deliberations by distracting one or more of the jurors...." *Dutkel*, 192 F.3d at 897. As in *Dutkel*, there is evidence that Quihuis's contacts with Malachowski and Darryl Henley left him "a 'disturbed and troubled man,' deeply concerned about his own and his family's safety." *Id.* at 898 (quoting *Remmer II*, 350 U.S. at 381, 76 S.Ct. 425). As in *Dutkel*, Quihuis "stated that he was 'very scared' by the contacts." *Id.* Quihuis's fears "may well have prevented [him] from thinking about the evidence or paying attention to the judge's instructions." *Id.* Finally, because Quihuis did not report the incident to the court, he "had to worry not only about threats to his family, but also about concealing his predicament from the court and his fellow jurors. It is possible that [Quihuis] was hesitant about engaging in the normal give and take of deliberations, for fear of giving himself away." *Id.*

In its brief and at oral argument, the government stated that it did not oppose a "limited remand" so that the district court could hear Quihuis's sworn testimony. Because Quihuis has now pleaded guilty to charges relating to his conduct in this case, it is likely that he will no longer be able to invoke his Fifth Amendment right against self-incrimination and that he may be compelled to testify. We agree that, given the change in circumstances, remand is appropriate in order to afford the district court an opportunity to determine whether the presumption of prejudice can be rebutted under the recently explicated *Dutkel* standard. Because it is clear that the appellants have made a prima facie showing that the bribery scheme had an adverse effect on Quihuis's deliberations, the government now carries the "heavy burden" of demonstrating that "there is no reason-

able possibility that [Quihuis] (or any other juror) 'was ... affected in his freedom of action as a juror' as to [appellants]." *Dutkel*, 192 F.3d at 899 (quoting *Remmer II*, 350 U.S. at 381, 76 S.Ct. 425). "Unless the district court is convinced that there is no reasonable possibility that the deliberations as to [appellants] were affected by the tampering, the court must vacate [their] conviction[s]." *Id.*

We are left with one further problem regarding the *Dutkel* remand. The appellants argue that Federal Rule of Evidence 606(b), when read with the *Remmer* cases, renders the presumption of prejudice effectively irrebuttable, because the rule precludes any testimony by a juror as to "any matter or statement occurring during the course of deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith...." Fed R. Evid. 606(b). It is clear that the rule permits jurors to testify about whether "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* Appellants contend, however, that juror testimony about the *effect* of extraneous information or improper contacts on a juror's state of mind is prohibited. Accordingly, appellants argue, if evidence of tampering is not uncovered prior to the verdict, *Remmer*'s presumption of prejudice becomes irrebuttable, because the court may not consider testimony tending to establish that the tampering had no material effect on the jury's deliberations. The appellants alternatively classify *Remmer*'s presumption as a "structural error" requiring per se reversal, because appellate review of the magnitude of the harm would be impossible without contravening Rule 606(b).

We have already rejected both of those arguments in *Dutkel*.[10] Although we did not discuss the tension between the gov-

---

10. *See id.* at 899 n. 4 (considering and reject-      ing "structural error" argument).

ernment's burden of rebutting the presumption of prejudice and the constraints of Rule 606(b), we expressly noted Rule 606(b) when reaching our decision. Nevertheless, we relied on the fact that the juror in question had "himself stated that he was 'very scared' by the contacts," as well as testimony from other jurors that the juror was "distracted and expressed fear about his family," as support for our conclusion that the juror's deliberations might have been affected by the tampering. *Dutkel,* 192 F.3d at 898. Similarly, the Fourth Circuit, in a well-reasoned opinion that more squarely confronts the interplay between the *Remmer* presumption and Rule 606(b), has distinguished between testimony regarding the affected juror's mental processes in reaching the verdict—which is barred by Rule 606(b)— and testimony regarding the juror's more general fear and anxiety following a tampering incident, which is admissible for purposes of determining whether there is a "reasonable possibility that the extraneous contact affected the verdict." *United States v. Cheek,* 94 F.3d 136, 144 (4th Cir.1996).

■ Thus, statements such as those that Quihuis provided to the FBI and to the defense investigator—which reveal Quihuis's professed anxiety about his own and his family's well being—do not fall within Rule 606(b)'s "mental processes" prohibition and properly form the basis for the presumption that the government must now rebut. In attempting to do so, the government may not ask Quihuis whether, for example, he relied on the evidence

introduced at trial in reaching his verdict. *See Cheek,* 94 F.3d at 143 ("By asking [the juror] whether he had listened to and considered all the evidence, the government was delving into [the juror's] mental processes about the sufficiency of the evidence in reaching his personal verdict. Such an inquiry exceeded the strict limits imposed by Rule 606(b)."). The government is free to question Quihuis, however, about his state of mind in general following the bribery attempt; the district court may then be called upon to evaluate the credibility of any testimony that contradicts Quihuis's earlier accounts.

The district court must be mindful that it "need not conclude that the verdict as to [the appellants] would have been different but for the jury tampering," *Dutkel,* 192 F.3d at 899, in order to reverse the convictions. The government has the burden of establishing not that the appellants would have been convicted with or without the bribery attempt, but rather, as *Dutkel* instructs, that there is no "reasonable possibility" that Quihuis was "affected in his freedom of action as a juror." *Id.* (quotations omitted). In directing district courts to consider such factors as whether the affected juror was frightened or distracted, and in placing the focus on the jury's deliberative process rather than on its verdict, *Dutkel* implicitly rejects the "overwhelming evidence of guilt" rationale that the district court applied below. In fact, *Dutkel,* like the two *Remmer* cases, does not so much as mention, anywhere in its analysis, the weight of the evidence at trial.[11]

---

11. The government cites two Seventh Circuit decisions and two out-of-circuit district court cases as support for the proposition that the weight of the evidence is a relevant factor in evaluating the prejudice from attempts to bribe or threaten sitting jurors. *See United States v. Smith,* 26 F.3d 739, 760 (7th Cir. 1994) (inquiry into reasonable possibility whether verdict was affected by possible tampering may involve consideration of "nature and extent of the evidence against defendants"); *United States v. Sanders,* 962 F.2d 660, 674 (7th Cir.1992) (court considered "overwhelming" evidence against defendants in evaluating effect of threat on juror); *Port Terminal & Warehousing Co. v. John S. James Co.,* 92 F.R.D. 100, 107 (S.D.Ga.1981) (court's

determination that bribe attempt was not prejudicial "bolstered by the weight of the evidence presented at trial"); *United States v. Allen,* 736 F.Supp. 914, 920 (N.D.Ill.1990) (in case where juror was threatened, "[o]verwhelming evidence of the defendants' guilt is a consideration in determining whether there is a reasonable possibility that the extraneous influence prejudiced defendants or was harmless"). The two district court cases declined to distinguish between typical situations in which jurors are exposed to extraneous influences and the "much more serious intrusion" of a bribe or threat. *Dutkel,* 192 F.3d at 895. As for the Seventh Circuit cases, we believe that *Dutkel* 's focus on the jury's deliberations, and its failure (as well as that of the two

On remand, the district court shall conduct its review in light of these principles, and determine whether the government has carried its burden of rebutting the presumption of prejudice arising from the attempted bribery of juror Quihuis.

## B. *Allegations of Racism*

All four appellants contend that their convictions must be reversed because their trial was tainted by juror Sean O'Reilly's racial bias, which appellants characterize as an "extraneous influence" not subject to Rule 606(b)'s prohibitions against juror testimony. In the alternative, appellants argue that even if Rule 606(b) bars the introduction of juror testimony regarding O'Reilly's racist statements in support of their claim that their right to an impartial jury was violated, that testimony may be considered as evidence that O'Reilly lied materially during voir dire, also compelling the grant of a new trial. Appellants emphasize that O'Reilly's alleged racism would have had a powerful impact in this trial, where three of the four appellants are African–American males and the prosecution's principal witness was a young white woman who had a sexual relationship with one of the African–American defendants.

The district court summarily rejected the appellants' claim that their trial was tainted by racial bias, holding that testimony regarding O'Reilly's "pre-verdict remarks" was foreclosed by Rule 606(b). The court did, however, consider the second question—whether O'Reilly's "claimed

statements" demonstrated that he had failed to answer truthfully questions posed to him during voir dire. Without making any findings concerning the actual content of O'Reilly's statements—about which there was conflicting testimony and considerable dispute—the court ruled that it did "not find that juror O'Reilly failed to answer honestly."

Courts and commentators have struggled with the apparent conflict between protecting a defendant's right to a fair trial, free of racial bias, and protecting the secrecy and sanctity of jury deliberations. *See generally Developments in the Law— Race and the Criminal Process: VII. Racist Juror Misconduct During Deliberations,* 101 Harv. L. Rev. 1595 (1988); Victor Gold, *Juror Competency to Testify that a Verdict was the Product of Racial Bias,* 9 St. John's J. Legal Comment. 125 (1993). Although the broad language of Rule 606(b) could plausibly be read to exclude all juror testimony regarding racial bias during deliberations—at least to the extent that such testimony might reveal the influence of racial bias on a juror's verdict— "courts faced with the difficult issue of whether to consider evidence that a criminal defendant was prejudiced by racial bias in the jury room have hesitated to apply the rule dogmatically." *Wright v. United States,* 559 F.Supp. 1139, 1151 (E.D.N.Y. 1983).

Appellants maintain that racial bias should be viewed as "extraneous prejudicial information" or as an "outside influence" that is expressly excluded from Rule 606(b)'s bar.[12] Even without characteriz-

---

*Remmers*) to consider the weight of the evidence, makes it plain that the ordinary weight of the evidence test is not applicable here. Whether the weight of the evidence—overwhelming or otherwise—may play *any* part in the district court's ultimate decision is not presently before us. It appears, however, that *Dutkel* would strongly caution against reliance on such a factor in a jury tampering case.

**12.** That would appear to be the approach adopted by the court in *Tobias v. Smith,* 468 F.Supp. 1287 (W.D.N.Y.1979), a case in which one juror, following the verdict, swore

in an affidavit that two other jurors had made patently racist comments during deliberations before voting to convict the African–American defendant. After noting that Rule 606(b) permits testimony regarding whether extraneous prejudicial influences were improperly brought to the jury's attention, the court concluded "that the statements in the juror's affidavit [were] sufficient to raise a question as to whether the jury's verdict was discolored by improper influences and that they [were] not merely matters of juror deliberations." *Id.* at 1290. The court ordered that a hearing be held during which the parties would "have an

ing racial bias as "extraneous," a powerful case can be made that Rule 606(b) is wholly inapplicable to racial bias because, as the Supreme Court has explained, "[a] juror may testify concerning any mental bias in matters *unrelated to the specific issues that the juror was called upon to decide ....*" *Rushen v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam) (citing Fed.R.Evid. 606(b)) (emphasis added). Racial prejudice is plainly a mental bias that is unrelated to any specific issue that a juror in a criminal case may legitimately be called upon to determine.[13] It would seem, therefore, to be consistent with the text of the rule, as well as with the broad goal of eliminating racial prejudice from the judicial system, to hold that evidence of racial bias is generally not subject to Rule 606(b)'s prohibitions against juror testimony.

Some courts have suggested that Rule 606(b) should generally apply to racist statements made by jurors during deliberations, unless the resulting prohibition would deprive defendants of their right to a fair trial.[14] The Seventh Circuit expressed that view as follows:

> The rule of juror incompetency cannot be applied in such an unfair manner as to deny due process. Thus, further review may be necessary in the occasional case in order to discover the extremely rare abuse that could exist even after the court has applied the rule and determined the evidence incompetent. In short, although our scope of review is narrow at this stage, we must consider whether prejudice pervaded the jury

room, whether there is a substantial probability that the alleged racial slur made a difference in the outcome of the trial.[15]

*Shillcutt v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1987). Or, as another court explained, "if a criminal defendant could show that the jury was racially prejudiced, such evidence could not be ignored without trampling the sixth amendment's guarantee to a fair trial and an impartial jury." *Wright,* 559 F.Supp. at 1151. In order to apply Rule 606(b) in this limited manner, a court would first have to receive the juror testimony in question, and then determine whether the testimony established that "prejudice pervaded the jury room" or that "the jury was racially prejudiced." In our circuit, however, it would not be necessary to demonstrate that "prejudice pervaded the jury room" in order to establish a constitutional violation; we have made clear that the Sixth Amendment is violated by "the bias or prejudice of even a single juror." *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998) (en banc). One racist juror would be enough.

In this case, there would be even stronger reason to conclude that Rule 606(b) should not bar juror testimony regarding O'Reilly's alleged racist statements, because the statements in question were made *before* deliberations began and *outside* the jury room. Rule 606(b)'s primary purpose—the insulation of jurors' private deliberations from post-verdict scrutiny—would not be implicated by permitting juror testimony about what O'Reilly allegedly said while carpooling with other jurors.

---

opportunity to question those jurors who [could] be found as to what was said and what occurred." *Id.* at 1291.

**13.** *See Dobbs v. Zant,* 720 F.Supp. 1566, 1573 (N.D.Ga.1989), *aff'd,* 963 F.2d 1403 (11th Cir. 1991), *rev'd on other grounds,* 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993).

**14.** For example, the court in *Smith v. Brewer,* 444 F.Supp. 482 (S.D.Iowa 1978), after concluding that Rule 606(b) applied to allegations of juror racism during deliberations, qualified that determination as follows: "Where ... an

offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by the influence of racial bias in the jury room, to ignore the evidence might very well offend fundamental fairness." *Id.* at 490.

**15.** The court's scope of review was "narrow" because the petitioner was challenging his state custody pursuant to 28 U.S.C. § 2254. Therefore, the very high standard the court applied to the petitioner's due process claim should not be applied to the direct appeal of a federal conviction.

■ While we find persuasive those cases that have exempted evidence of racial prejudice from Rule 606(b)'s juror incompetency doctrine, we need not decide today whether or to what extent the rule prohibits juror testimony concerning racist statements made during deliberations or, as in this case, outside of deliberations but during the course of the trial. Where, as here, a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror's alleged racial bias is indisputably admissible for the purpose of determining whether the juror's responses were truthful. *Hard v. Burlington Northern R.R.*, 812 F.2d 482, 485 (9th Cir.1987) ("Statements which tend to show deceit during voir dire are not barred by [Rule 606(b)]."). If appellants can show that a juror "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause," then they are entitled to a new trial. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

The appellants contend that juror O'Reilly's racist statements establish conclusively that he answered questions untruthfully in his voir dire questionnaire. On that questionnaire, O'Reilly submitted that his overall view of interracial dating was "neutral," that he had never had a bad experience with a person of a different race, and that race would not influence his decision as a juror in any way. The district court rejected appellants' claim, finding that the record did not establish that O'Reilly had answered any questions untruthfully.

The government does not dispute that a juror who answered in the affirmative questions about whether race would influence his decision would be subject to a challenge for cause. Instead, the government argues that appellants' claim is based on an unsupportable inference that anyone who uses the word "nigger" must hold racial bias against all African–Americans,

and that the district court was not obligated to draw that inference.

■ We have considerable difficulty accepting the government's assumption that, at this time in our history, people who use the word "nigger" are not racially biased. In the present case, however, it is necessary to determine precisely what O'Reilly did or did not say before evaluating the truthfulness of his voir dire responses. The district court erred by rejecting appellants' claim without making any findings concerning whether O'Reilly actually made a racist statement and, if so, its specific content. Because there is considerable dispute as to the facts, we are unable to review the district court's conclusion in the absence of a specific finding as to which, if any, of the various accounts is correct. For example, in Malachowski's first account, he maintained that O'Reilly had declared, "All the niggers should hang." Later, when Malachowski was pleading guilty to charges related to his role in the bribery scheme, he recanted his initial report and insisted that O'Reilly had simply used the word "nigger," but not in relation to the defendants in this case. Quihuis's version of events was different; it tended, however, to support Malachowski's original statement. Quihuis reported to the FBI that O'Reilly had stated, "The niggers are guilty," or simply "Niggers are guilty." Finally, O'Reilly himself denied having made any racist statements at all, although we note that O'Reilly's own denials may be entitled to less weight than the accounts of other witnesses. "Because the bias of a juror will rarely be admitted by the juror himself, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it, it necessarily must be inferred from surrounding facts and circumstances." *McDonough,* 464 U.S. at 558, 104 S.Ct. 845 (Brennan, J., concurring) (citations omitted).

From the district court's order, it is not possible to determine whether the court concluded that O'Reilly had not made any

racist statements, or whether it believed that while he did make such statements, that fact was not sufficient to establish that he answered untruthfully during voir dire. Resolution of the disputed question as to what O'Reilly did or did not say may well be determinative of whether his responses to the questionnaire were truthful. We therefore remand to the district court with instructions that the court enter detailed findings and make a specific determination regarding O'Reilly's alleged statements and racial bias.

## C. *Rex Henley*

The district court found, by a preponderance of the evidence, that appellant Rex Henley was aware of the bribe attempt before the verdict was rendered; accordingly, the court ruled that Henley's motion for a new trial was untimely filed because it was not based on newly discovered evidence.[16] The court recognized that there was no direct evidence of Henley's pre-verdict knowledge, but nevertheless concluded that "the strong circumstantial evidence compels that reasonable inference." Henley maintains that the district court's factual finding that he had pre-verdict knowledge of the bribery attempt was clearly erroneous, and that we should treat him in the same manner as the other three appellants for purposes of this appeal.

**16.** For purposes of this section C., when we refer to "Henley" we are referring to Rex Henley.

**17.** A separate proceeding would inevitably be the consequence if we declined to permit Henley to raise his jury tampering claim now. Henley would certainly raise that claim in a future proceeding under 28 U.S.C. § 2255.

**18.** *See, e.g., United States v. Cabrera,* 222 F.3d 590, 2000 WL 1199535, *7 n. 3 (9th Cir. Aug.24, 2000) (although only one of two co-defendants raised issue on appeal, court applies its findings to both defendants); *United States v. Olano,* 934 F.2d 1425, 1439 (9th Cir.1991), *rev'd on other grounds,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (same, applying Fed. R.App. P. 2); *see also Walter v. United States,* 969 F.2d 814, 817 (9th

We need not resolve the question that Henley raises as to the correctness of the district court's untimeliness ruling, because we elect, for reasons of judicial economy, to consider Henley's jury tampering claim along with his admittedly timely juror bias claim and the identical tampering and bias claims raised by his co-appellants. Because we conclude that, as a matter of substantive law, all four appellants are entitled to the benefit of further proceedings with respect to both claims, it seems just and sensible to allow all of the claims to proceed together, rather than to require the district court to conduct a separate proceeding for one of the appellants on one of his claims.[17]

Our decision to allow Henley to proceed with his appeal from the "untimely" portion of his new trial motion is supported by Rule 2 of the Federal Rules of Appellate Procedure, which vests in the court of appeals the discretionary authority to "suspend any provision of these rules in a particular case and order proceedings as it directs" in order to "expedite its decision or for other good cause...."[18] Because we find ample "good cause" for facilitating the district court's resolution of all four appellants' claims in a single proceeding, we exercise that discretion here.

Accordingly, we instruct that, on remand, Henley's claim with respect to the jury tampering issue be adjudicated together with the identical claims of the other appellants on that point, and along with Henley's and the other appellants' claims regarding the racial bias question.[19]

Cir.1992) ("[T]he federal interest in compliance with appellate procedures is not adequate to warrant treating co-defendants differently on appeal.").

**19.** In barring Henley from raising his jury tampering claim in a motion for a new trial, the district court held only that Henley's evidence was not "newly discovered," not that his pre-verdict knowledge deprived him, as a general matter, of the right to obtain relief on the basis of the jury tampering claim. Whether Henley's possible awareness of the attempted bribe may in any way affect his right to a trial untainted by jury tampering is a question that we leave to the district court in the first instance. We note that only one court of appeals appears to have addressed the question whether a defendant who is involved in

### III. *Conclusion*

We remand this case to the district court so that it may determine whether, in light of *Dutkel,* the attempted bribery of juror Quihuis entitles the appellants to a new trial. We also remand so that the district court may reconsider its determination that juror O'Reilly failed to answer truthfully a material question or questions on voir dire. In this regard, the district court shall enter detailed findings concerning whether O'Reilly actually made racist remarks and, if so, their specific content.

REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

jury tampering may obtain a new trial on that ground. In *United States v. Forrest,* 620 F.2d 446 (5th Cir.1980), the Fifth Circuit granted relief to a defendant notwithstanding the defendant's actual participation in a jury tampering incident. The court explained that it was not affording the defendant a "windfall," or providing other defendants with an incentive to bribe jurors; because jury tampering is a serious felony subject to severe penalties, "[w]e do not think our ruling today will encourage defendants to embrace the risk of exposure to that punishment in exchange for a chance of reversal on appeal with remand for retrial." *Id.* at 458–59. (Under 18 U.S.C. § 201, a defendant faces up to 15 years imprisonment for bribery of a juror.) Here, there is no allegation that Henley participated in the tampering incident, only that he was aware of it.