**Stevie Lamar FIELDS, Petitioner–Appellant–Cross–Appellee,**

**v.**

**Jeanne WOODFORD, Warden of California State Prison at San Quentin, Respondent–Appellee–Cross–Appellant.**

**Nos. 00–99005, 00–99006.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001

Filed Feb. 22, 2002.

David S. Olson, Agapay, Levyn & Halling, Los Angeles, California, for the petitioner-appellant-cross-appellee.

Carol Frederick Jorstad, Deputy Attorney General, Los Angeles, California, for the respondent-appellee-cross-appellant.

Before: KOZINSKI, RYMER and SILVERMAN, Circuit Judges.

RYMER, Circuit Judge.

California state prisoner Stevie Lamar Fields appeals the district court's summary judgment on his 28 U.S.C. § 2254 habeas petition with respect to his 1979 convictions for the robbery and murder of Rosemary Cobbs; the robbery of Clarence Gessendaner; the kidnaping for robbery, robbery, rape, forced oral copulation, and assault with a deadly weapon on Gwendolyn Barnett; the kidnaping for robbery and forced oral copulation of Cynthia Smith; and the kidnaping, robbery, rape, and forced oral copulation of Colleen Coates. However, the district court granted Fields's cross-motion for summary judgment on the penalty phase, ordering that the sentence of death be vacated and set aside unless Fields is given a new trial because of the jury's consideration of extraneous evidence. The state cross-appeals this ruling.

We agree with the district court on all of the claims having to do with Fields's conviction except for his claim of juror bias. As to it, we conclude that an evidentiary hearing is needed. Given this disposition, we do not reach any of the penalty phase issues.

I

Fields was paroled on September 13, 1978, after serving a sentence for the voluntary manslaughter of Albert A., whom he had bludgeoned to death with a barbell.[1] On September 27, 1978, Gail Fields,

1. The facts are taken from the California Supreme Court's opinion denying Fields's direct

Fields's sister, saw her brother with Rosemary Cobbs, a student librarian at the University of Southern California, at the Fields residence. When Gail entered Fields's bedroom the next morning, Rosemary was naked on the bed and Fields was standing by the door. Fields handed Gail a check signed by Rosemary in the amount of $185. He then ordered Rosemary to write another check for $222, and told her that he would "bump her off" because "she run a game on him," by writing a check for less than the balance of her account. Gail took the second check, cashed it at a nearby bank, and gave the money to Fields, who returned $22 to her.

The following day, Rosemary and Fields again entered Fields's bedroom together. Fields came out of the bedroom and asked Debbie, his brother's former girlfriend and a frequent visitor at the Fields residence, if she wanted to see how he punished his girlfriends. Debbie declined, but Fields pushed her to the bedroom door, where she saw Rosemary naked and tied to Fields's bed. Fields reentered the bedroom with a gun, ordered Rosemary to give him more money, and told her that he was going to take her on a long trip "and she wasn't never going to come back."

That afternoon, Debbie saw Fields, Gail, and Rosemary (fully dressed and carrying her purse) leave the Fields residence. Fields and Rosemary got into the back seat of a borrowed car, and Gail drove the vehicle toward the freeway. As Gail approached the on-ramp to the freeway, she heard a gunshot and Rosemary's cry of "Oh, God." Fields shot Rosemary four more times. He told Gail that he had to make sure Rosemary was dead. Fields then struck Rosemary in the head with a blunt object.

Gail drove to an alley near the Fields residence. Fields removed Rosemary's body and left it in the alley. Debbie saw Fields and Gail return to the Fields residence without Rosemary. Debbie walked to the alley and saw the body. She walked back to the Fields residence and asked Fields about Rosemary, to which he replied, "[s]he was going on a long trip and was never coming back."

A family friend who loaned Fields the car testified that it was returned to him with two bullet holes. A bank official verified the $222 check from Rosemary to Gail. The police officers who later searched the Fields residence uncovered Rosemary's purse, driver's license, and a torn check from Rosemary to Gail for $185.

On the evening of October 2, 1978, Clarence Gessendaner parked his Trans Am Pontiac outside of a drug store. When Gessendaner returned to his car, Fields, armed with a gun, approached him with another man and demanded his car keys. Gessendaner handed Fields his car keys and started to leave, but Fields called him back and asked for money. Gessendaner gave him what he had, about $4 or $5. The victims of Fields's subsequent crimes all observed Fields driving Gessendaner's Trans Am.

Gwendolyn Barnett and Cynthia Smith, both prostitutes, saw Fields and William Blackwell, a 17–year–old friend of Fields, drive by in Gessendaner's Trans Am early in the morning on October 5, 1978. Fields and Blackwell, who had a gun, walked up to the women and ordered them into the car. Fields asked them if they had any money.

Fields then drove to an alley near the Fields residence. He took the gun from Blackwell and directed Gwendolyn and Cynthia to enter the house and go to the

appeal. *People v. Fields*, 35 Cal.3d 329, 197 Cal.Rptr. 803, 673 P.2d 680 (1983).

upstairs bedrooms. Fields ordered Gwendolyn to remove her clothes and took $50 she had hidden in her stockings. He told Gwendolyn to do whatever Blackwell wanted, then left the room. Blackwell raped Gwendolyn. Fields took Cynthia into another room, ordered her to disrobe, and took about $100 from her.

Later Fields, Blackwell and the two women assembled in the same room and smoked marijuana. Fields told Gwendolyn to have oral sex with Cynthia. After she complied, he ordered her to perform anal sex. When Gwendolyn refused, Fields struck her with the gun, breaking Gwendolyn's jaw and the handle of the gun. Fields then raped Gwendolyn, while Blackwell raped Cynthia.

Gwendolyn passed out on a mattress in the bedroom. When she awoke, she saw Blackwell holding a knife, and heard Fields tell Blackwell, "Man, go and cut the bitch up. You can't just leave her laying there." Fields told Cynthia to clean up the blood from Gwendolyn's injury.

Fields and Blackwell ordered the women to dress and accompany them in the Trans Am to pick up more prostitutes to rob. They found two women whom Fields again compelled at gunpoint to enter the car. After they returned to the Fields residence, Fields allowed Gwendolyn and Cynthia to leave.

Cynthia took Gwendolyn to a hospital for treatment of her jaw. A subsequent police search of the Fields residence turned up Gwendolyn's wig and blouse and Cynthia's identification card. The police also observed extensive blood stains on the mattress where Gwendolyn had lain.

A few hours after releasing Gwendolyn and Cynthia, Fields and Blackwell approached Colleen Coates, an 18–year–old student at the University of Southern California, in a restaurant parking lot. Fields and Blackwell ordered her at gunpoint into the Trans Am, which was in a nearby alley. Blackwell drove Fields and Colleen to the Fields house.

Fields ordered Colleen into his bedroom. Blackwell asked for the keys to Colleen's car, and Fields demanded that she give them to him. When Blackwell left with the keys, Fields looked through Colleen's purse, took about $12, and asked if she had a checking account.

Fields instructed Colleen to remove her clothes, and struck her for not removing them fast enough. He ordered her to perform oral sex on him and to submit to intercourse.

Fields then demanded more money from Colleen. Colleen told him that she could withdraw $2,000 from a Crocker Bank savings account through a computerized night teller. She tore a page from the phone book giving the address for the local Crocker Bank branch, and she, Fields, and Blackwell drove to the branch. Fields decided that there were too many people around, and so returned to the Fields residence without withdrawing the money.

After ordering Colleen to smoke marijuana and demanding that one of her girlfriends bring him more money, Fields told her that he would have to kill her because she had too many counts on him. Colleen begged him not to kill her. She tried to escape by throwing herself backwards through a closed window in the bedroom. Colleen broke the window and cut her back, but Fields grabbed her and pulled her back into the house. Fields then told Colleen that he would not kill her unless she tried to escape.

The following morning, Fields told Colleen that he would let her go if she would buy marijuana for him. She drove him to a location about four blocks away and purchased the drugs for him. Fields then

gave Colleen back her car, watch, jewelry, and some of her clothes. She drove directly to her apartment and called her sister, who notified the police.

When the police arrived at the Fields residence, Fields had already left. He and Blackwell appeared later at Debbie's house, where they stayed for two days. Fields was arrested October 9, 1978, at a Greyhound bus station. He was charged with robbery of a car from Gessendaner, kidnaping, robbery, forced oral copulation, and rape of Coates; kidnaping for robbery and forced oral copulation of Smith; kidnaping for robbery, robbery, rape, forcible oral copulation, and assault with a deadly weapon of Barnett; and with the murder of Rosemary Cobbs. Special circumstances were alleged, that the murder was willful, deliberate, and premeditated and committed during the commission of a robbery.

Carl Jones was appointed to represent Fields on March 16, 1979. Fields changed his plea from "not guilty" to "not guilty by reason of insanity," but the jury found that he was not insane. The guilt phase began on June 18, 1979. The jury found Fields guilty on all counts and found the special circumstance to be true.

The penalty phase took place July 16, 1979. The jury returned a death verdict, and Fields was subsequently sentenced to death.

The California Supreme Court affirmed the judgment. *People v. Fields,* 35 Cal.3d 329, 197 Cal.Rptr. 803, 673 P.2d 680. Fields filed a petition for writ of habeas corpus in the federal district court on May 25, 1993, which he later amended in light of *In re Harris,* 5 Cal.4th 813, 21 Cal. Rptr.2d 373, 855 P.2d 391 (1993) (articulating multiple exceptions to the *Dixon*[2] rule preventing prisoners from using habeas as

a substitute for direct appeal) and *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) (same). Finding unexhausted state claims, the district court stayed federal proceedings on October 20, 1993 to allow Fields the opportunity to exhaust them by filing a second habeas petition in the California Supreme Court. It was denied on October 14, 1994 on the procedural ground of untimeliness. *Fields v. Calderon,* 125 F.3d 757, 759 (9th Cir. 1997). The United States Supreme Court again denied certiorari. *Fields v. California,* 514 U.S. 1022, 115 S.Ct. 1369, 131 L.Ed.2d 225 (1995).

Fields filed a second amended habeas petition in the district court on March 21, 1995. The district court granted the State's motion to dismiss Fields's second federal habeas petition on June 10, 1996 on procedural grounds. This court permitted Fields to take an interlocutory appeal of the district court's dismissal order on August 27, 1996. We held that the *Dixon* rule was not an adequate and independent state ground to bar federal review of Fields's defaulted claims, and remanded the case to the district court for examination of those claims on the merits. *Fields v. Calderon,* 125 F.3d 757, 765(9th Cir. 1997). On January 21, 2000 the district court granted the state's motion for summary judgment on guilt phase claims, and denied its motion and granted Fields's as to his claim [VI(D)] of juror misconduct during the penalty phase.

Fields filed an application for a Certificate of Appealability (COA) on February 16, 2000 on all claims that he currently raises on appeal. The district court granted a Certificate of Probable Cause. Because Fields filed his habeas petition before the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA

---

**2.** *In re Dixon,* 41 Cal.2d 756, 264 P.2d 513 (1953).

does not apply to the merits of his appeal. However, on April 26, 2000, the Supreme Court held in *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), that AEDPA governs any habeas petitioner's appeal commenced after the statute's effective date, April 24, 1996, regardless of when the petition was filed. Consequently, we treat his "notice of appeal as a request for a COA on the issues raised in the briefs, and grant a COA on those issues as to which the petitioner has made the requisite 'substantial showing of the denial of a constitutional right.'" *Schell v. Witek*, 218 F.3d 1017, 1021 n. 4 (9th Cir.2000). We find that Fields has made such a showing with respect to the issues briefed on appeal, therefore we grant a COA as to each.

## II

Fields argues that at least one of the jurors was actually or presumptively biased, thereby violating his Sixth Amendment rights. Fields also claims that the jury improperly considered inflammatory testimony about the race of the women to whom he was talking at the time of his arrest, and that the jury was racially prejudiced against him. Individually and cumulatively, Fields submits, these errors invalidate his convictions.

## A

Fields contends that, during voir dire, juror Hilliard concealed material facts and gave misleading answers relating to the

kidnap, robbery, and rape of his wife. In his view, complete and honest answers would have revealed that Hilliard was presumptively biased against Fields and unable to view the evidence objectively. Further, Fields argues that Hilliard discussed the case with his wife during the trial and thus was actually biased, or became so, as the case progressed.

Responding to the trial judge's posted questions during voir dire,[3] Hilliard stated:

> Juror Hilliard: Okay. My wife was assaulted and beaten, robbed, two years ago Christmas.
>
> The Court: That occurred here in Los Angeles?
>
> Juror Hilliard: Yes. In Lynwood.
>
> The Court: Was anyone ever arrested in connection with that incident?
>
> Juror Hilliard: Not to my knowledge.
>
> The Court: All right. In other words, your wife never went to court as a witness?
>
> Juror Hilliard: No. She went to a couple of lineups.
>
> The Court: Some of the charges involved in this case are robberies. Do you think it is going to make it difficult for you to be a fair, impartial juror in the case now pending before this court as a result of the experience your wife went through?
>
> Juror Hilliard: I doubt it. I think I'd base it strictly on the charges and the evidence that's presented.

---

**3.** The trial court's written questions included: (1) the prospective juror's business or occupation; (2) the prospective juror's spouse's business or occupation; (3) the ages of the prospective juror's children and their occupations or where they attended school; (4) the general area where the prospective juror lived; (5) the prospective juror's previous jury experience; (6) whether the prospective juror had ever been a crime victim or witness, arrested or charged with a crime, or involved in criminal charges or litigation; (7) whether the prospective juror had any legal or law enforcement background, training or experience; (8) whether the prospective juror had any friends or relatives who were in law or law enforcement; and (9) whether the prospective juror knew of any reason that he or she could not serve as a fair and impartial juror.

Juror Hilliard: ... I don't see any reason I couldn't look upon this thing strictly on the evidence involved.

The Court: And you would accept and follow the law given to you by the court and apply it, to the best of your ability, to the facts as you determine them to be?

Juror Hilliard: Definitely.

Jones asked no questions of Hilliard, and he was seated without challenge.

In 1993, Fields obtained declarations of Hilliard, his wife Diane, and other jurors. Diane Hilliard indicates that during the incident juror Hilliard described, she was accosted at gun-point by a young African American male in his early twenties, bound, blindfolded, driven to a secluded area, beaten, raped and robbed. The attacker told Hilliard's wife that he knew where she lived and would be back to "finish you off." He was never apprehended. These events had a radical effect on the Hilliards' lives. Mrs. Hilliard says that during the trial she began to suspect her accoster might be Fields; she asked her husband if she could go to the courtroom, but he said no. One juror's declaration indicates that Hilliard often talked about his wife, but does not say what about; another states he was aware that Hilliard's wife had been raped. In a 1995 declaration, Hilliard states that he "was an objective and impartial juror and never confused the events that occurred to my wife with the facts presented in the Fields case. I did not urge the jury members to follow any course of action because of my wife's experience. To the contrary. I was one of the jurors who initially defended Fields in deliberations." A 1999 declaration avers that Hilliard stands by his 1995 declaration.

The district court found that Fields was not denied his right to an impartial jury. It applied the rule from *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), that to obtain relief on a claim that a juror failed to disclose information during voir dire, Fields must "first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 104 S.Ct. 845. The court noted that there was no evidence that Hilliard intentionally withheld the fact that his wife had been raped, and that even if Hilliard had disclosed this information, it would not have provided a valid basis for a challenge for cause because Hilliard stated under oath that he could be impartial and base his decision on the evidence presented at trial. The court found that Fields presented nothing to contradict Hilliard's statement. It also observed that Fields had an opportunity to question Hilliard further during voir dire and chose not to do so.

Fields posits that Hilliard's responses were misleading and that his declaration of impartiality was equivocal. Fields further asserts that Hilliard and his wife "repeatedly discussed the facts of the Fields case"; that Hilliard "explained" to his wife he did not want her to attend trial because he did not want "it to create a problem"; and that Hilliard did not want to create a loophole and let Fields off.

The state argues that Hilliard was not actually biased. Further, it notes that there is no evidence that Hilliard intentionally withheld the fact that his wife had been raped, and that absent evidence that he lied, to hold that he was presumptively biased would be a new rule barred by *Teague v. Lane,* 489 U.S. 288, 310, 109

S.Ct. 1060, 103 L.Ed.2d 334 (1989).[4] The state points out that Hilliard disclosed that his wife had been assaulted, and that rape is a sexual assault. In any event, the state maintains, the facts in this case are different from those in other cases where this court has found implied bias.

▮ [1] The Sixth Amendment guarantees criminal defendants a fair trial, which assumes in a case tried to a jury "a jury capable and willing to decide the case solely on the evidence before it." *McDonough*, 464 U.S. at 554, 104 S.Ct. 845 (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). A defendant is denied the right to an impartial jury even if only one juror is biased or prejudiced. *Tinsley v. Borg*, 895 F.2d 520, 523–24(9th Cir.1990). The voir dire process allows examination of prospective jurors for possible bias. "Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *McDonough*, 464 U.S. at 554, 104 S.Ct. 845. Indeed, " '[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.' " *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir.2000) (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 n. 2 (9th Cir.1998)).

▮ We have analyzed juror bias under two theories, actual bias and implied bias. Either may support a challenge for cause. *Gonzalez*, 214 F.3d at 1111. A prospective juror must be removed for cause if his views would prevent or sub-

stantially impair the performance of his duties as a juror. *See Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Gonzalez*, 214 F.3d at 1112 (" '[a]ctual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.' ") (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997)). The determination whether a juror is actually biased is a question of fact. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir.1998) (en banc). Here, there were no findings by the state trial or appellate court on the issue of bias, nor did the district court hold an evidentiary hearing.

The district court did not address the question of implied bias, reaching its conclusion that Fields was not denied his right to an impartial jury based only on its view that Hilliard did not intentionally or dishonestly withhold information and stated that he could be an impartial juror. This may well be correct, as there is no direct evidence that Hilliard's answers were intentionally misleading. He disclosed that his wife had been assaulted, beaten and robbed; no follow-up questions were asked, and Hilliard never denied that his wife had been kidnaped or raped. As this court has recognized, jurors may sometimes "misunderstand a question or bend the truth a bit to avoid embarrassment." *Dyer*, 151 F.3d at 973. After first indicating that he "doubted" it would be difficult for him to be fair and impartial as a result of the experience his wife went through, and that he "thought" he would base it strictly on the charges and evidence presented, Hilliard told the trial judge that he saw no reason he couldn't look upon this strictly on the evidence. *See United States v. Alexander*, 48 F.3d 1477, 1482–83 (9th Cir.1995) (discussing initial equivocal

---

4. We do not consider whether Fields's claim is *Teague*-barred, so that the district court is free to do so after the facts have been determined.

response followed by unqualified indication of ability to serve impartially). Nothing in the record controverts these statements, and Hilliard has since sworn that he was an objective and impartial juror who never confused the events that befell his wife with the facts presented in *Fields*. At the same time, had a completely forthcoming response been given, Hilliard would have revealed that his wife had been *kidnaped* (or at least, that she had been taken somewhere at gun point), beaten, *raped*, and robbed. This makes the closeness of his wife's experience to the charges in the case far more apparent, and clearly implicates our law on implied bias.

■ The Supreme Court has never explicitly adopted (or rejected) the doctrine of implied bias, but both concurring opinions in *McDonough* seem to embrace it and the Ninth Circuit has inferred or presumed bias on rare occasions. *See, e.g., United States v. Allsup*, 566 F.2d 68 (9th Cir.1977); *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979), *Tinsley*, 895 F.2d at 528; *Dyer*, 151 F.3d at 979. Bias may be implied only in "exceptional circumstances." *See McDonough*, 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, Stevens and O'Connor, JJ., concurring); *id.* at 558, 104 S.Ct. 845 (Brennan and Marshall, JJ., concurring in the judgment). We have been willing to presume bias in "extreme" situations where the prospective juror's lies give rise to an inference of implied bias, *Dyer*, 151 F.3d at 979, and "from the 'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships." *Tinsley*, 895 F.2d at 527 (quoting *Allsup*, 566 F.2d at 71).

Fields primarily relies on *Allsup, Eubanks,* and *Dyer.* In *Allsup*, two jurors in a bank robbery trial were employees of a different branch of the bank that was robbed. On direct appeal, we held that

their relationship to the subject of the trial was too close for them to be impartial, therefore the trial court erred by failing to excuse the jurors for cause. *Eubanks* was a heroin conspiracy trial, where (again on direct appeal from denial of a motion for new trial) we presumed bias when a juror did not disclose that two of his children were in prison for heroin-related crimes. On a juror qualification form, the juror had indicated that he was married but had no children, and the juror did not respond to a question by the judge on voir dire "have any of you or members of your immediate families ever been personally interested in the defense of a criminal case or a witness for the defense in criminal case?" Had he answered truthfully, this court believed the trial court would have excused him. In these circumstances, the court concluded that the juror's sons' involvement with heroin barred the inference that the juror served impartially. In *Dyer,* the juror on voir dire in a murder prosecution answered "no" to questions about whether she or any of her relatives had ever been the victim of any type of crime, and whether she or any of her relatives had ever been accused of any offense other than traffic cases. In fact, the juror's brother had been shot and killed six years earlier, and her husband was then in jail. We concluded that the juror plainly lied, and that her lies gave rise to an inference of implied bias on her part. *See also Green v. White,* 232 F.3d 671, 676 (9th Cir.2000) (the jury foreperson in a murder trial lied about his own prior felony conviction on a written jury questionnaire and in voir dire; bias presumed because the "pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced 'destructive uncertainties' into the fact-finding process").

Fields submits that a similar kind of emotional involvement is present in this

case as in *Eubanks* and *Dyer*, because Hilliard's wife had been affected by crimes similar to the ones of which he was accused, and that, as in *Allsup*, Hilliard also had a reasonable fear of violence as a result of crimes similar to the ones of which Fields was accused. There is no question that Hilliard's wife was the victim of a crime that was quite similar to the charges against Fields. Hilliard's wife had been kidnaped, beaten, raped, and robbed by a young African–American male, whereas Fields (a young African–American male) was being prosecuted on three counts of kidnaping, robbery, and rape, as well as one count of murder with robbery as the special circumstance.

*Tinsley* is also instructive. There, a state prisoner who was convicted of rape contended in his § 2254 petition that he was denied a fair trial because one juror, Smith, was biased. Smith stated during voir dire that she was a psychiatric social worker who was trained to deal with rape victims, but notwithstanding the nature of the charges involved in Tinsley's case, would be able to be a fair juror. She said that she did not recall counseling any rape victims. However, it turned out that she had testified once in behalf of a rape victim, an experience she found anxiety provoking. At a hearing on Tinsley's motion for new trial, Smith testified that she had been fair as a juror and had no recollection of thinking about the prior counseling episode during deliberations. Acknowledging that bias may be implied in "those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances,"[5] we concluded

that the circumstances did not warrant a presumption of bias. However, we noted that neither Smith nor a close relative had been a rape victim or rapist (which distinguishes *Tinsley* from this case). There was no personal connection between Smith and the defendant or victim, and she had no prejudicial information about the defendant himself.

■ Beyond what these cases indicate, it is an open question whether dishonesty is required before bias may be found. We took note of this in *Dyer*, observing that "[b]ecause we conclude that [the juror] lied, we need not decide whether dishonesty is a necessary predicate to a finding of juror bias." *Dyer*, 151 F.3d at 979 n. 12. *But see United States v. Gonzalez*, 214 F.3d 1109, 1113 (9th Cir.2000) (suggesting that implied bias is purely objective). However, we are reluctant to resolve Fields's claim without a factual determination on the point. Whether a juror intentionally conceals or gives a misleading response to a question on voir dire about relevant facts in his or a relative's background may shed light on the ultimate question of that juror's ability to serve impartially. Here, there is no credibility determination to which we owe deference, and in the absence of one it is difficult for us to say that Hilliard was *not* intentionally misleading or to accept his statement of impartiality at face value. Under the circumstances, we conclude that an evidentiary hearing is appropriate. *See Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1492–93, 146 L.Ed.2d 435 (2000) (evidentiary hearing to determine partiality required where one of juror's responses to voir dire query was not forthcoming and another was factually misleading).

---

**5.** *Tinsley*, 895 F.2d at 527(adopting test articulated by the Fourth Circuit in *Person v. Miller*, 854 F.2d 656, 664 (4th Cir.1988)).

■ Fields also argues that Hilliard's discussions with his wife during the course of the trial independently violated his constitutional right to be tried by an impartial jury based on the evidence presented at trial. *See, e.g., Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (any communication or tampering with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial); *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Tinsley,* 895 F.2d at 528 (noting that courts have found implied bias where juror is apprized of prejudicial information about the defendant); *United States v. Maree,* 934 F.2d 196, 201–02 (9th Cir.1991) (juror discussed case with two friends who recommended that juror find defendant guilty). We do not read Diane Hilliard's declaration, as Fields does, to show that there were in fact substantive conversations about the subject matter of the trial with Hilliard.[6]

Regardless, Fields argues that Diane Hilliard's declaration creates a reasonable inference of improper communications. We agree that this possibility is not foreclosed. The district court did not address this issue, which leaves us without findings. As we are remanding in any event for an evidentiary hearing on Hilliard's bias, we leave it to the district court in the first instance to determine whether Hilliard and his wife had any discussions during the trial about its subject matter that affected Hilliard's ability to be fair and impartial. We remand to the district court to hold an evidentiary hearing on this point.

## B

■ Fields argues that the jury improperly considered testimony by James Mateer, a Los Angeles police officer who was present when Fields was arrested, that the two women Fields was conversing with at the time of his arrest were white. The details are spelled out in Part IV(A), *infra.* The trial judge sustained defense counsel's objection to the prosecutor's line of questioning, ordered the testimony struck from the record, and instructed the jury to disregard it. Nevertheless, Fields submits, the jury considered this evidence, which he says was racially inflammatory, based on two juror declarations adduced in 1993. One indicates that it was obvious that several white jurors were more upset by the crimes against Colleen Coates, a white victim, than by the murder of Rosemary Cobbs, an African American, and that "[d]uring the penalty deliberations, several jurors mentioned how if defendant would kill a member of his own race then he would not hesitate to kill a white person." Another states that she thought if defendant would murder someone of his own race then he would certainly be willing to murder someone of a different race. This juror believed that some other jurors may have also thought about these factors. However, these declarations are inadmissible under Federal Rule of Evidence 606(b) because they pertain to internal influences on the jury's deliberations. *See Tanner v.*

---

**6.** Mrs. Hilliard only declares that when her husband was selected for jury duty and "we" learned something about the facts, she began to suspect that her attacker might be Fields. She does not say that Hilliard told her anything beyond what the case he was selected for was about. She does not say that Hilliard and she discussed the facts repeatedly, just that she kept asking to go to court. She does not say that she told Hilliard of her suspicions about Fields. Nor does Mrs. Hilliard aver that *Hilliard* told her why he did not want her to attend trial; her declaration states only what *she* thought Hilliard was thinking. However, Mrs. Hilliard's state of mind is not material, and her thoughts about Hilliard's state of mind are simply speculation without foundation.

*United States,* 483 U.S. 107, 121, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

Fields argues otherwise, first because the declarations were presented to the California Supreme Court in support of his exhaustion petition and are thus part of the record of the state proceedings that "shall be admissible" in the federal habeas proceeding under pre-AEDPA § 2254(f).[7] We disagree, because the records that § 2254(f) refers to are official records of findings, opinions, and factual determinations by state courts, not evidentiary submissions by the parties.

■ Second, Fields maintains that the juror declarations are admissible even under Rule 606(b) because they show extraneous prejudice. While this may be true if they did, *see, e.g., United States v. Henley,* 238 F.3d 1111, 1118 (9th Cir.2001), we disagree that these declarations go to anything other than the jurors' "mental processes," which the Rule expressly excludes from the scope of what a juror can testify to. Even so, the declarations are vague and speculative; they do not show that any racist statements were made. *Cf., e.g., Henley,* 238 F.3d at 1120–21 (juror reportedly said something to the effect that "the niggers are guilty"); *Tobias v. Smith,* 468 F.Supp. 1287, 1289–90 (W.D.N.Y.1979) (jury foreperson said "[y]ou can't tell one black from another").

■ Fields alternatively contends that if the declarations cannot be considered, the jury's consideration of Mateer's stricken testimony denied him due process. We do not think so, for even if the jury did consider the fact that Fields was talking with two white women when he was arrested, evidence of Fields's guilt on all counts was so overwhelming that we cannot say this was prejudicial. It could not possibly have had a substantial or injurious effect

in determining the verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

### C

Fields's claim that several of the jurors were racially prejudiced against him fails for the same reasons.

### D

Fields contends that his convictions must be overturned because of the cumulative effect of jury misconduct. "Although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir.1996). Putting aside Fields's juror bias claim, we see neither error nor cumulative error that influenced the outcome under *Brecht.*

### III

Fields asserts that his counsel rendered ineffective assistance by failing to conduct meaningful voir dire, specifically, by failing to question at all six of the jurors who were ultimately empaneled, including Hilliard. Fields argues that competent counsel, given Hilliard's disclosure and his equivocal answer as to his ability to be impartial, would have questioned him further about the incident, challenged him for cause, and if that challenge were denied, exercised a peremptory challenge to remove him from the jury.

To prevail on the merits under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Fields must show that his "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Id.* at

---

7. This section is now codified at 28 U.S.C. § 2254(g).

687, 104 S.Ct. 2052. Counsel's performance is measured "as of the time of counsel's conduct," *id.* at 690, 104 S.Ct. 2052, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Because Fields must show both deficient performance and prejudice, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

▇▇▇▇▇ Fields must "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. This requires showing more than the possibility that he was prejudiced by counsel's errors; rather, he must demonstrate that the errors *actually* prejudiced him. *See id.* This occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

Whether counsel was deficient is a close call. On the one hand, it is tough to imagine why he did not pursue what kind of assault Hilliard's wife suffered, given that the non-capital charges against Fields included rape. On the other hand, it may be that he decided not to emphasize Fields's behavior through additional questioning, or that counsel believed Hilliard's statement that he could base his decision strictly on the evidence despite his wife's experience. At oral argument the state suggested another possibility: that counsel may have wanted to keep Hilliard on the jury because he was African–American.

We confronted somewhat similar situations in *Wilson v. Henry,* 185 F.3d 986, 991 (9th Cir.1999) and *United States v. Quintero–Barraza,* 78 F.3d 1344, 1349–50 (9th Cir.1995). In *Wilson,* counsel failed to focus on the defendant's criminal history during voir dire; all jurors stated that they would be fair and would follow the law as instructed, and we concluded that counsel's choice to rely on such a commitment merits deference as a tactical decision. Counsel in *Wilson* also failed to challenge a juror who believed that felons should be barred from possessing arms, and we held that this was not so inherently prejudicial that a decision to accept the juror could be deemed ineffective. In *Quintero–Barraza,* we deferred to trial counsel's decision to seat a juror who expressed the belief that persons on trial are guilty until proved innocent, and that it would be difficult for him to be impartial.

We do not know what Jones's thinking was, which makes it difficult to conclude that it was a reasonable strategic decision. We assume there was no prejudice from counsel's failure to voir dire any juror other than Hilliard because Fields makes no argument that there was; however, we cannot say whether failure to ask questions of Hilliard beyond the court's voir dire was prejudicial until the issue of Hilliard's impartiality is finally determined. *See Gonzalez,* 214 F.3d at 1111 (seating juror who should have been dismissed for cause requires reversal) (quoting *United*

*States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000)).

At the end of the day, the issue of Hilliard's bias and whether counsel was ineffective will turn on the same determination. But apart from the issue of Hilliard's bias, which will be resolved separately, we cannot say that failure to inquire beyond the court's voir dire was outside the range of reasonable strategic choice or that it would have affected the outcome.

## IV

Fields claims that he was denied due process when the prosecutor elicited racially inflammatory testimony from Officer Mateer that Fields was conversing with two white women at the time of his arrest, and urged the jury to view Rosemary Cobb's murder through the eyes of the victim.

 On federal habeas review, we do not ask whether the "prosecutor['s] remarks were undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation omitted). "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson v. Borg,* 74 F.3d 1571, 1576 (9th Cir.1996) (quoting *Jeffries v. Blodgett,* 5 F.3d 1180, 1191 (9th Cir.1993)). If prosecutorial misconduct is established, and it was constitutional error, we then apply the *Brecht* harmless error test. *See Thompson,* 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless."). "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Williams v. Borg,* 139 F.3d 737, 744 (9th Cir.1998) (quoting *Darden,* 477 U.S. at 181, 106 S.Ct. 2464).

### A

 The prosecution called James Mateer, a police officer who worked as a security guard for the Greyhound Bus Lines. He identified Fields as someone he had seen at the depot on October 9, 1978. The prosecutor asked Mateer whether Fields was alone and Mateer responded: "He appeared to be alone, but he was talking to two females." The prosecutor continued: "White or black?" Mateer answered "white." Jones's first objection was overruled, after which Mateer was asked, and answered about their appearance that it "appeared as if they were in distress or were uncomfortable with the defendant's presence." The trial court denied Fields's request for a mistrial, but ordered Mateer's testimony stricken. The jury was instructed "to just keep those [events and circumstances] out of your memory, you are not to deliberate on them, you are not to consider them; they are not to be discussed by you in any way." Regardless of whether the inquiries were irrelevant or improper, Fields cannot have been prejudiced. The circumstance was not mentioned again, *cf. United States v. Cabrera,* 222 F.3d 590, 596 (9th Cir.2000) (repeated irrelevant references to defendants' national origin), and the court's instruction, which the jury is presumed to follow, *United States v. Span,* 75 F.3d 1383, 1390 (9th Cir.1996), cured whatever impropriety there was.

### B

 In his closing argument, the prosecutor asked the jury to "think of yourself as Rosemary Janet Cobb" and described the crimes committed against her from her perspective. In doing so "[he] inappropriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an

individual victim." *Drayden v. White*, 232 F.3d 704, 712–13 (9th Cir.2000). However, the prosecutor's remarks did not so infect the trial with unfairness that Fields suffered a violation of his due process rights. The statements he made in closing were supported by the evidence such that if he "had delivered exactly the same speech in the third person, it would have been proper." *Id.* at 713. Further, the court instructed the jury that statements made by the attorneys were not evidence. Finally, given the eyewitness testimony about what Fields did to Cobb, there is no reasonable probability that the prosecutor's emotional appeal affected the verdict.

### C

We agree with the district court that the cumulative effect of any purported prosecutorial misconduct did not render Fields's trial fundamentally unfair.

### V

■ Fields argues that the trial court's refusal to sever the capital murder and robbery of Rosemary Cobbs from the noncapital crimes against Gwendolyn Barnett, Cynthia Smith, Colleen Coates, and Clarence Gessendaner, when identity was not at issue, rendered his trial fundamentally unfair by leading the jury to infer criminal propensity and by tainting the jury's consideration of the weaker capital crime by considering the evidence cumulatively. On habeas review of a state conviction, we have held that

> the propriety of a consolidation rests within the sound discretion of the state trial judge. The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.

*Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir.1991) (citation omitted).

■ We agree with the district court that Fields made no such showing. The evidence submitted in support of Fields's capital crime and his noncapital crimes was cross-admissible because the crimes were sufficiently similar to reflect a common modus operandi, and to show motive and intent. *See Bean v. Calderon*, 163 F.3d 1073, 1084–86 (9th Cir.1998) (emphasizing that cross-admissibility of evidence is critical in determining whether joinder is constitutionally permissible and holding that joinder was violative of due process where "[t]he State virtually concede[d] the absence of cross-admissibility."). Fields drove each of his female victims to his house, ordered each at gunpoint into his bedroom where he proceeded to rob and use them for sexual gratification, and drove them away from the house to find money or other victims to rob or, in Cobbs's case, to murder her. Gessendaner's car was used to drive Barnett and Smith back to his house, and to drive them to find more women to rob, as well as to drive Coates to his house and to a bank where she was to get more money for him. Nor was the capital count poorly supported, or supported by substantially weaker evidence than the non-capital counts. *Cf. Park v. California*, 202 F.3d 1146, 1150 (9th Cir.2000) ("This circuit recognizes potential due process concerns when a poorly-supported count is combined with one that is well supported."). Indeed, the evidence of guilt on all counts is strong and, given the percipient testimony of Fields's sister and Montgomery with respect to the capital count, the evidence of Field's guilt on it was overwhelming.

### VI

Putting aside the issue of possible structural error arising from juror bias,

vacating Fields's conviction is not required because of the cumulative effect of any purported errors.

## VII

■ Fields submits that the prosecutor pursued an improper theory to support the robbery-murder special circumstance that made Fields death-penalty eligible—that Fields robbed Cobbs (a second time) of her purse in the car, whereas to qualify the robbery cannot be merely incidental to a murder.[8] Fields also contends that the trial court failed to instruct on the law relating to incidental robbery and independent felonious purpose under *People v. Green*, 27 Cal.3d 1, 59–63, 164 Cal.Rptr. 1, 609 P.2d 468 (1980), and concludes that due process was violated if the jury found the special circumstance true on an improper theory.

During his closing argument, the prosecutor stated that Cobbs was forced to write out a check which Fields's sister cashed and gave to him. Then Fields took Cobbs out and killed her. The prosecutor noted that she had her purse with her and that the purse ended up at Fields's house in a trash bag with the wallet and cash missing. He went on to state that as far as the check is concerned, the court would instruct that the robbery is complete when the perpetrator has reached a place of safety and is in unchallenged possession of the stolen property. His argument was that Fields was not in unchallenged possession of the check money while Cobbs was still alive or of the purse which Cobbs still had. The California Supreme Court rejected the Attorney General's argument

on appeal that robbery of the purse, contemporaneous with the murder, was alone sufficient to support the special circumstance finding. *Fields*, 35 Cal.3d at 365 n. 15, 197 Cal.Rptr. 803, 673 P.2d 680. But it upheld the finding, for, as that court explained, the robbery occurred when Fields compelled Cobbs to write a check to his sister at his house, and the murder was linked to it by Fields's motive to punish Cobbs for trying to frustrate the robbery as well as by his continued control over her until he killed her in the car, thereby achieving safety and unchallenged possession of the proceeds. *Id.* at 367–68, 197 Cal.Rptr. 803, 673 P.2d 680.

If it were impossible to tell which theory of culpability the jury followed in reaching its verdict, relief might be required. *Suniga v. Bunnell*, 998 F.2d 664, 669 (9th Cir.1993). However, the trial court did not instruct on alternative theories. Although the instruction that was given was not a model of clarity, the lack of clarity had to do with "hot flight" and was in Fields's favor. *Fields*, 35 Cal.3d at 364–65, 197 Cal.Rptr. 803, 673 P.2d 680. Otherwise, it appears correctly to have captured the essence of the California felony murder rule, that a robbery is still in progress after the original taking and is complete when the perpetrator has reached a place of temporary safety. Accordingly, the jury could not have reached a verdict on a theory that did not exist.

### Conclusion

We affirm on all guilt phase claims except for the claim of juror bias, on which

8. Former California Penal Code section 190.2 provided that a defendant found guilty of first degree murder may be sentenced to death if he "was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such acts causing death and any of

the following additional circumstances exists .... The murder was willful, deliberate, and premeditated and was committed *during the commission* or attempted commission *of* any of the following crimes.... *Robbery*, in violation of Section 211 ...." Cal.Penal Code, former § 190.2, subd. (c) (emphasis added).

we are unable to make a determination without the benefit of a more fully developed record by the district court. Therefore, we vacate the district court's judgment on Claim VI(D), and remand for an evidentiary hearing. We vacate submission of the remaining issues having to do with the penalty phase raised in Fields's appeal and the state's cross-appeal and defer submission on these claims until the constitutionality of Fields's conviction is settled.

AFFIRMED IN PART; VACATED AND REMANDED IN PART; SUBMISSION VACATED AND DEFERRED IN PART.

SILVERMAN, Circuit Judge, concurring.

I agree with most of Judge Rymer's thorough and thoughtful opinion. On the issue of possible juror bias, I agree that the declaration of Diane Hilliard, which says a lot about her but very little about Mr. Hilliard, the juror, nevertheless warrants further investigation by way of an evidentiary hearing.

My one point of disagreement concerns the majority's treatment of Mr. Hilliard's statements during voir dire. The majority's decision to remand the case for an evidentiary hearing on actual or implied bias is based on a faulty premise—that the court asked Hilliard a specific question that he answered in a "misleading" or less than "completely forthcoming" manner. The fact is that the court did *not* ask Hilliard whether any family members or friends had ever been the victim of a crime.[1] Hilliard *volunteered* the information of his own accord. Far from being less than forthcoming, Hilliard was the just opposite.

Because the question about family-members-as-victims was never asked, it is puzzling how Hilliard's voluntary disclosure of the attack on his wife can be characterized as anything but remarkably candid. But even if Hilliard had been asked, "Have any members of your family even been the victim of a crime?" it is hard to understand how Hilliard could be impugned for stating quite truthfully that his wife had been assaulted, beaten, and robbed two years prior. To repeat, this is all academic because the question was never asked. But even if it had been, Hilliard should not have been expected to answer as if he were taking a criminal law exam, identifying by name every conceivable crime that the facts might have suggested. He said that his wife had been "assaulted and beaten, robbed." That was absolutely true. And to be technical about it, Hilliard disclosed that his wife had been beaten *and* assaulted, which connotes more than just being beaten.

Because Hilliard was not only truthful but voluntarily forthcoming, I fail to see how this case can possibly be equated with *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979), and *Dyer v. Calderon*, 151 F.3d 970 (9th Cir.1998), in which prospective jurors answered direct questions with deliberate lies.

That, then, brings us to whether Hilliard's truthful answer should have resulted in his exclusion from the jury sua sponte. "[T]o obtain a new trial ... a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for challenge for cause." *Mc-Donough Power Equip. v. Greenwood*, 464

---

1. The questions put to the prospective jurors can be found in footnote three of the majority opinion.

U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). The first prong of *McDonough* simply is not present here.

As for the second prong, neither the petitioner nor the majority has cited a single case in which a prospective juror was deemed impliedly biased solely on the strength of truthful answers revealing that a prospective juror's family member had, years before, been the victim of a similar crime, particularly when the prospective juror had assured the court that the other incident would not affect his ability to be fair and impartial. The trial judge saw and heard Hilliard and was uniquely positioned to assess Hilliard's credibility. The judge's acceptance of Hilliard's assurances is entitled to deference. *See United States v. Miguel,* 111 F.3d 666, 673 (9th Cir.1997) (in a prosecution for abusive sexual contact with a child, there was no abuse of discretion in failing to excuse for cause prospective jurors who had been victims of child molestation themselves or had close relatives who had.).

All of the implied bias cases cited by the majority, with one exception, concern dishonest answers by prospective jurors. The exception, *United States v. Allsup,* 566 F.2d 68(9th Cir.1977), a bank robbery case, involved two jurors who were employees of the bank that was robbed, albeit at a different branch. *Allsup* is merely an application of the standard rule that prospective jurors should not be empaneled if they are related by family or employment to a defendant, witness or victim in the very case to be tried.

I understand what the district judge is supposed to do on remand concerning Diane Hilliard's declaration: The judge is to determine whether Mr. Hilliard discussed the case with his wife and, if so, whether their discussions affected Hilliard's impartiality. On the other hand, I haven't a clue what the district judge is supposed to do,

on remand, about Hilliard's truthful answer of 22 years ago that his wife had been beaten, assaulted and robbed, his assurance that he would "look upon this thing strictly on the evidence involved," and "definitely" "accept and follow the law" and "apply it ... to the facts" to the best of his ability. Because Hilliard's voir dire statement was true (and voluntarily disclosed to boot), I fail to see what fact the district judge is supposed to find with respect to it. What matters is Hilliard's state of mind back in 1979, not how he feels about his jury service today.

Because the circumstances of the crime against Mrs. Hilliard are undisputed, the transcript of Mr. Hilliard's voir dire is all that is needed to decide whether he should have been dismissed sua sponte from the venire. It reveals no constitutional error in Hilliard's empanelment. Accordingly, I would hold that the petitioner is not entitled to relief on that basis. As for whether Hilliard and his wife had improper communications about the case during the trial, *that* requires a hearing.