

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2003

# Williams v. Price

Precedential or Non-Precedential: Precedential

Docket No. 00-2305

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Williams v. Price" (2003). *2003 Decisions.* Paper 237.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/237

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 9, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 00-2305

_____

RONALD A. WILLIAMS,

Appellant

v.

JAMES PRICE, Superintendent,
SCI-Pittsburgh; D. MICHAEL
FISHER, Attorney General

_____

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

District Court Judge: Honorable Donald E. Ziegler
(D.C. No. 98-cv-01320)

_____

Argued: February 10, 2003

Before: ALITO and McKEE, *Circuit Judges*, and
SCHWARZER,* *District Judge*

(Filed: September 9, 2003)

_____

* The Honorable William W Schwarzer, Senior Judge of the United States District Court for the Northern District of California, sitting by designation.

CHRIS RAND EYSTER (Argued)
100 Ross Street, Suite 304
Pittsburgh, PA 15219
*Counsel for Appellant*

TIMOTHY F. McCUNE (Argued)
Butler County District Attorney's
 Office
P.O. Box 1208
Butler, PA 16003-1208
*Counsel for Appellee*

## OPINION OF THE COURT

ALITO, *Circuit Judge*:

This is an appeal from a District Court order denying a petition for a writ of habeas corpus filed by Ronald A. Williams. Williams, who is serving a term of life imprisonment in Pennsylvania for first-degree murder, argues that his right to an impartial jury was abridged because the state courts refused in post-trial proceedings to admit certain evidence of racial bias on the part of members of the jury. Williams sought to introduce this evidence to show, among other things, that jurors lied during voir dire when they denied racial prejudice. The state courts refused to consider the evidence at issue based on the well-established evidence rule that generally bars juror testimony for the purpose of impeaching a verdict (the "no impeachment" rule). We hold that the state courts' refusal to receive some but not all of this evidence violated Williams's clearly established constitutional rights, and we therefore vacate the decision of the District Court and remand for an evidentiary hearing at which Williams will have the opportunity to introduce the improperly excluded evidence and to attempt to prove that a juror lied during voir dire.

## I.

On August 5, 1984, at about 10:15 p.m., Archie Bradley stepped off a city bus outside a truck depot maintained by

his employer, Nor-Sub Trucking, in Cranberry, Pennsylvania. Minutes later, witnesses heard five gunshots nearby. One witness also saw the triggerman standing over Bradley's body and holding a gun. Immediately before the witnesses contacted police, a patrolling traffic officer observed a suspicious car leaving the Nor-Sub parking lot. He noted the license plate and initiated a pursuit that escalated in intensity. The driver of the fleeing car threw various objects out the window, striking the police car with one of them, and succeeded in eluding the officer, but the car overturned on an embankment. Police discovered it abandoned. Retracing the route of the car chase, police recovered a Mac-10 firearm, a silencer, and an ammunition cartridge, and the police matched the gun forensically to the object that had struck the police cruiser. A search of the vehicle yielded more guns and ammunition, as well as a slip of paper on which was written "Nor-Sub 10:15."

In the early-morning hours of August 6, Williams telephoned Jewel Hayes, an intimate acquaintance, explaining that he was stranded somewhere and needed a ride. Hayes agreed, but when she could not find the designated pick-up location, she asked a police officer for directions. Police traced the phone call and arrested Williams and his brother Raymond. The eyewitness to the shooting identified Williams as the gunman. A 911 caller who claimed to have witnessed the vehicle leaving the crime scene initially described the car as blue and its driver as white, but this witness later decided that the car was gray and the driver was black. The witness eventually identified Williams, who is African American, as the driver. Both parties in their briefs refer to other inculpatory and exculpatory evidence, but none of it has a bearing on this appeal.

During voir dire proceedings in the Williamses' 1985 trial, the trial court asked two questions regarding racial bias:

> Do you personally believe that blacks as a group are more likely to commit crimes of a violent nature involving firearms?

> Can you listen to and judge the testimony of a black person in the same fashion as the testimony of a white person, giving each its deserved credibility?

All the jurors who were selected to serve answered "no" to the first question and "yes" to the second. The jury convicted both Williams and his brother and sentenced them to death.

Shortly after the verdicts were returned, Williams's attorney filed post-trial motions. Among other things, he sought a new trial on the ground that the jury had received and had been influenced by information not introduced in court. In support of this motion, Williams's attorney submitted the affidavit of juror Judith Montgomery. Montgomery, who died in 1996, stated that "[p]rior to the deliberation process as to Ronald Alfred Williams' sentencing," another juror had told the entire jury that, according to information received from an alternate, Ronald Williams had committed two murders, that Raymond Williams was wanted for two other murders, and that, "if this jury did not give the death penalty, (regarding Raymond Williams) another [jury] would." App. 8a.

On February 11, 1985, the trial judge held an evidentiary hearing on these allegations. Raymond Williams and his attorney were present at the hearing, but neither Ronald Williams nor his lawyer was there. At the beginning of the hearing, the judge stated that "a juror may not impeach his or her own verdict" but that there is "a narrow exception . . . allowing post-trial testimony of extraneous influences which might have affected the jury during their deliberation." App. 46a-47a. Montgomery, the other jurors, and a reporter for a local newspaper who had overheard a conversation among the jurors then testified. This testimony revealed that, after the guilt-phase verdict but before the penalty-phase verdict, half of the jurors had heard that Ronald Williams was wanted on other murder charges. *See Commonwealth v. Williams*, 522 A.2d 1058, 1066 (Pa. 1987) (direct appeal of Raymond Williams). The trial judge nevertheless refused the request for a new trial because he was satisfied by the testimony of the jurors that they had not been influenced by this information in imposing sentences of death. *See id.* On appeal, however, the Pennsylvania Supreme Court vacated the death sentences imposed on both brothers and remanded for the imposition of sentences of life imprisonment. *Id.* at 1067;

*Commonwealth v. Williams*, 561 A.2d 714, 719 (Pa. 1989) (direct appeal of Ronald Williams). The state supreme court concluded that prejudicial extraneous information had tainted the death verdicts, but the court saw no need to disturb the guilty verdicts since the testimony at the post-trial hearing had established conclusively that none of the jurors had heard the objectionable information until after the guilty verdicts had been returned. 522 A.2d at 1065-68 & n.5; 561 A.2d 719.[1]

In 1994, Ronald Williams, represented by new counsel, filed a state Post-Conviction Relief Act ("PCRA") petition in which he contended that members of the jury had lied during voir dire when they answered the questions about racial prejudice. In support of this motion, Williams relied on a new affidavit by Montgomery and another affidavit by Jewel Hayes, who had testified at trial.

Montgomery's affidavit stated:

> [W]hen I was Juror No. 9 in the trial of Commonwealth of Pennsylvania vs. Ronald Williams and Raymond Williams . . . I was called "a nigger lover" and other derogatory names by other members of the jury. Remarks were made to me such as "I hope your daughter marries one of them" . . . . The jurors were given information by an alternate juror who was told by [the] Sheriff . . . that the "men were wanted in other states and if we don't get them another state would" and "that Raymond [Williams, Appellant's brother and co-defendant] was going to die anyway as he shot and crippled a man for life in Michigan. The man lived and was able and willing to testify against Raymond, so his black ass was cooked anyway."

App. 6a.

---

1. The court did not order a new sentencing hearing because it concluded that it was not authorized to do so under state law. 521 A.2d at 1067. In Ronald Williams's appeal, the court held that, in view of the vacatur of his death sentence, the defendant's absence from the post-trial hearing due to the unavailability of his attorney was inconsequential. 561 A.2d at 719.

Hayes's affidavit averred:

> Subsequent to the proceedings in this case . . . I ran into Juror Number Two (2) in the lobby of the Courthouse. . . . Upon seeing me he stated "All niggers do is cause trouble" I am not sure whether this was stated directly to me but it was stated for my benefit and loudly enough for me to hear and to get a rise out of me. During our confrontation he also stated "I should go back where I came from."

App. 7a.

On July 18, 1995, the court held an evidentiary hearing on this issue. Prior to the receipt of testimony, the court ruled that evidence of what went on "in the courtroom, or in the jury room" would not be admitted but that evidence of any extraneous information that might have affected the guilty verdict would be received. App. 90a. Montgomery again testified, and she reaffirmed that the information about the other murder charges against Williams had not been received until after the guilty verdict was returned. *Id.* at 48a-57a. Hayes was not called as a witness.

The PCRA Court denied Williams's petition. Stating that Williams had argued that racial slurs had allegedly been uttered by jurors "during jury deliberations,"[2] the Court wrote that "it is firmly established that after a verdict is recorded and the jury discharged, a juror may not impeach the verdict by his or her own testimony." App. 52a. The Court added that, while there is an exception to this rule for "extraneous influences on the jury deliberation process," the alleged slurs were not extraneous and thus did not fall within the exception. *Id.* The Court did not explain why it did not consider Hayes's evidence.

---

2. Although Williams argued that he was entitled to post-conviction relief because jurors had lied during voir dire, the PCRA Court characterized Williams's argument as one claiming ineffective assistance of counsel. Amend. App. 45a, 52a. However, because the PCRA Court rejected Williams's argument on the ground that the underlying issue regarding the racial slurs lacked "arguable merit," Amend. App. 52a, it is apparent that the Court's characterization of the claim had no effect on its decision to deny relief. ("Amend. App." refers to the "Amendment to Appendix for Appellant" that was submitted after this case was argued.)

On appeal to the Superior Court, Williams argued that his federal constitutional right to an impartial jury had been abridged by the PCRA Court's refusal to consider the evidence in the Montgomery and Hayes affidavits for the purpose of determining whether jurors had lied during voir dire. *See* Amend. App. 40a-43a. Since the PCRA Court had refused to consider this evidence due to the "no impeachment" rule, the clear implication of Williams's argument was either that this rule did not apply when evidence was offered to prove that a juror lied during voir dire or that under these circumstances the rule had to give way to his constitutional right to an impartial jury. However, the discussion in Williams's brief did not spell out either of these arguments, and the Superior Court affirmed based on the PCRA Court's analysis. *Commonwealth v. Williams*, No. 0076, slip op. at 8 (Pa. Super. Nov. 14, 1996).

Williams filed a petition for allocatur that raised the issue now before us in virtually the same words as his Superior Court brief, Amend. App. at 95a-98a, but the Pennsylvania Supreme Court denied review. *Commonwealth v. Williams*, 699 A.2d 735 (Pa. 1997).

Williams then filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Pennsylvania. A Magistrate Judge issued a report and recommendation concluding that the petition should be denied. At the outset of her discussion of the pertinent issue, the Magistrate Judge noted that Williams had "submitted affidavits of one juror [i.e., Montgomery] and one trial witness [i.e., Hayes], R & R at 33, but the Magistrate Judge made no further reference to Hayes. Indeed, the Magistrate Judge later stated that "the state courts refused to consider [Williams's] proposed submission of affidavits by *two jurors*" based on the "no impeachment" rule, and the Magistrate Judge concluded that Williams had not "demonstrated that the state courts' actions were 'contrary to' *Tanner [v. United States*, 483 U.S. 107 (1987)] and other relevant Supreme Court cases, which do not permit the type of post-verdict *jury impeachment testimony* [Williams sought] to introduce." R & R at 34-35 (emphasis added). The District Court adopted the Report and Recommendation without elaboration, and this appeal

followed. A panel of our court granted a certificate of appealability on the following questions:

> Was Williams denied due process in violation of the Fourteenth Amendment or a fair trial or impartial jury in violation of the Sixth Amendment because (1) jurors were disingenuous on voir dire in answering questions about racial bias; or (2) [is this] a rare case which is an exception to the "no-impeachment rule"? *See United States v. Henley*, 238 F.3d 111 (9th Cir. 2001); *Shillcutt v. Gagnon*, 827 F.2d 1155 (7th Cir. 1987).

## II.

### A.

Our standard of review in this case is governed by 28 U.S.C. § 2254(d)(1). Under this provision, federal habeas relief may not be awarded as to any claim that a state court has adjudicated on the merits "unless the adjudication of the claim . . . resulted in a decision that was *contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d), (d)(1) (2002) (emphasis added). "[C]learly established Federal law, as determined by the Supreme Court," *id.*, "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." *Id.* at 405-06. A decision "involve[s] an unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or if the state court "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it

should apply." *Id.* at 407. We review de novo the District Court's application of section 2254(d). *See Banks v. Horn*, 271 F.3d 527, 531 (3d Cir. 2001).

### B.

Williams points to *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) ("*McDonough*"), as the Supreme Court precedent that the state courts contradicted or unreasonably applied. In *McDonough*, the losing parties in a civil trial in federal court argued that they were entitled to a new trial on the ground that a juror had failed to disclose material information in response to a question asked during voir dire. The Supreme Court held that in order "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.

Although *McDonough* was a federal civil case, a state court decision failing to apply this same rule in a criminal prosecution would represent an unreasonable application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1). The *McDonough* Court based its decision on the following principle:

> One touchstone of a fair trial is an impartial trier — "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

*McDonough*, 464 U.S. at 554. *Smith*, the precedent on which *McDonough* relied, was a habeas case in which a state prisoner claimed that he was denied due process because of juror bias. Accordingly, to hold that the right recognized in *McDonough* is not available to a defendant in a state criminal case would be an "unreasonabl[e] refus[al] to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. at 407; *see Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002); *but see Montoya v. Scott*, 65 F.3d 405, 418-19 (5th Cir. 1995) (reserving decision on question).

*McDonough*, however, did not decide the issues raised in this appeal. *McDonough* addressed the right of a party to obtain a new trial upon making a particular showing, not the admissibility of evidence to make that showing. As far as the admissibility of evidence is concerned, the most that may fairly be taken from *McDonough* is that a state may not adopt evidence rules that entirely frustrate the ability of objecting parties to make the showing specified in that case. *Cf. Smith*, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.") No further limitations on the power of a state to fashion its own evidence rules may reasonably be extracted from *McDonough* alone. Certainly *McDonough* cannot be read as "clearly establish[ing]" constitutional limits on state "no impeachment" rules.

## C.

The Supreme Court decision that best addresses the interplay between a defendant's constitutional right to offer evidence of juror misconduct and the traditional "no impeachment" rule is *Tanner v. United States*, 483 U.S. 107, 116-17 (1987). In *Tanner*, the defendants argued that the trial judge had erred in refusing to conduct an evidentiary hearing at which jurors would be allowed to testify about alcohol and drug use by jurors during the trial. The defendants maintained that this testimony was not barred by Federal Rule of Evidence 606(b), which codifies the "no impeachment" rule. In addition, the defendants contended that, even if the testimony was prohibited by Rule 606(b), the trial judge's refusal to receive the evidence violated their constitutional right to a competent jury. 483 U.S. at 116-17.

The Supreme Court disagreed. After holding that the testimony at issue was barred by Rule 606(b), the Court also rejected the defendants' constitutional argument, noting that the "no impeachment" rule is supported by "long-recognized and very substantial concerns." *Id.* at 126-27. *Tanner* strongly suggests that the exclusion of evidence of juror misconduct pursuant to the traditional "no impeachment" rule is constitutional because of the

important purposes that the rule has long been recognized as serving. But of course *Tanner* does not necessarily mean that the converse is true, i.e., that it is necessarily *un*constitutional for a state to adopt a version of the "no impeachment" rule that bars more testimony than does the traditional rule. In such a case, a court would have to look beyond *Tanner* in order to determine whether this expanded rule violated the Constitution or fell within the states' broad power to fashion the rules of evidence applicable in their own courts. *See Duckworth v. Owen*, 452 U.S. 951, 952 (1981) (Rehnquist, J., dissenting from denial of certiorari).[3]

## D.

Just how far beyond the traditional rule a jurisdiction could go without violating the Constitution is an unsettled question. The principal Supreme Court cases striking down exclusionary state evidence rules involve situations bearing little resemblance to those of the present case. In *Washington v. Texas*, 388 U.S. 23 (1967), a state rule prohibited a co-participant in a crime from testifying for the defense. The Court stated that the Constitution is offended "by arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories

---

3. Surprisingly, there are court of appeals cases that apply Federal Rule of Evidence 606(b) in habeas cases challenging evidentiary rulings by state courts. *See, e.g., McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997), *rev'd on other grounds*, 130 F.3d 833, 835 (9th Cir. 1997) (en banc)); *Bibbins v. Dalsheim*, 21 F.3d 13, 16-17 (2d Cir. 1994); *Silagy v. Peters*, 905 F.2d 986, 1008-09 (7th Cir. 1990); *Stockton v. Virginia*, 852 F.2d 740, 743-44 (4th Cir. 1988). In our view, these decisions are wrong. The Federal Rules of Evidence do not govern state court proceedings. *See* Fed. R. Evid. 101. States are free to adopt whatever evidence rules they wish so long as they do not violate the federal Constitution. *See Burgett v. Texas*, 389 U.S. 109, 113-14 (1967). While Federal Rule of Evidence 606(b) applies in evidentiary hearings held in federal court under 28 U.S.C. § 2254, *see* Fed. R. Evid. 1101(e); *Gosier v. Welborn*, 175 F.3d 504, 511 (7th Cir. 1999), Rule 606(b) does not apply to state court proceedings. *Duckworth v. Owen*, 452 U.S. 951, 952 (1981) (Rehnquist, J., dissenting from denial of certiorari); *Loliscio v. Goord*, 263 F.3d 178, 187 (2d Cir. 2001); *Doan v. Brigano*, 237 F.3d 722, 735 n.8 (6th Cir. 2001).

that presume them unworthy of belief." *Id.* at 22. The Court added that, because the rule at issue permitted a co-participant to testify if the witness was called by the prosecution or had previously been acquitted of the crime, the rule could not "even be defended on the ground that it rationally set[ ] apart a group of persons who are particularly likely to commit perjury." *Id.*

In *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), a murder defendant was precluded from bringing to the jury's attention the fact that another man, McDonald, had confessed to the murder in the presence of three witnesses. At trial, the defendant called McDonald to the stand, but McDonald denied committing the murder, and the defendant was not permitted to cross-examine him about the confession because state law prohibited a party from impeaching the party's own witness. *Id.* at 295. The defendant then attempted to question the three witnesses about the confession, but this evidence was ruled to be inadmissible hearsay because the state did not recognize an exception for declarations against penal, as opposed to, pecuniary interest. *Id.* at 299. Noting that the state had not even attempted to "defend" or "explain [the] underlying rationale" of the rule prohibiting a party from impeaching the party's own witnesses, *id.* at 297, the Supreme Court concluded that this rule, combined with the "mechanistic[ ]" application of the hearsay rule, had deprived the defendant of a fair trial "under the facts and circumstances" of the case. *Id.* at 302-03.

In *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), a murder defendant's confession was found before trial to have been voluntary and thus admissible. At trial, the defendant wanted to convince the jury that the confession was unreliable due to the circumstances under which it was given, but this evidence was ruled inadmissible. *Id.* at 685-86. The Supreme Court held that the defendant's conviction had to be reversed, observing that neither the state supreme court nor the prosecution had "advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence." *Id.* at 691.

In *Rock v. Arkansas*, 483 U.S. 44, 55 (1987), a homicide defendant underwent hypnosis to refresh her memory.

Because state law excluded all hypnotically refreshed testimony, the defendant was not allowed to testify to any facts that she had not reported prior to the hypnosis. Observing that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve," *id.* at 56, the Court held that the defendant's right had been abridged because no specific determination had been made that the excluded testimony was unreliable. *Id.* at 61-62. The Court noted that the state court's ruling had deprived the defendant of the testimony of the only witness present at the scene and had infringed the defendant's interest in testifying in her own behalf, *id.* at 57, "an interest that [the Court] deemed particularly significant." *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

None of these cases clearly establishes just how far a jurisdiction may go in excluding evidence of juror misconduct. The only principle applicable to the present case that these cases may be viewed as "clearly establish[ing]" is that a state evidence rule may not severely restrict a defendant's right to put on a defense if the rule is entirely without any reasonable justification.

## III.

The "no impeachment" rule has been traced to a decision by England's Lord Mansfield, *Vaise v. Delaval*, 99 Eng. Rep. 944 (K.B. 1785), and the rule once carried the appellation "Mansfield's rule." According to Wigmore, "with the prestige of the great Chief Justice, [this rule] soon prevailed in England, and its authority came to receive in the United States an adherence almost unquestioned." JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2352 at 697 (McNaughton rev. 1961).

Several different forms of the rule were common in this country, but in general a distinction was drawn between, on the one hand, mistakes and misconduct by the jury during deliberations and, on the other hand, improper outside influences. *See* CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 247 at 53-54 (2d ed. 1994). In *Mattox v. United States*, 146 U.S. 140, 149 (1892), the

Supreme Court stated that a " 'a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind' " or as to "the motives and influences which affected [the jury's] decision." *See also McDonald v. Pless*, 238 U.S. 264, 269 (1915) ("[T]he losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict."); *Hyde v. United States*, 225 U.S. 347 (1912).

Rule 606(b) of the Federal Rules of Evidence codifies this approach. It provides:

> Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions . . . except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention.

FED. R. EVID. 606(b).

Pennsylvania has long followed a similar rule. Under the governing cases at the time of Williams's trial, a juror was precluded from invalidating or impeaching a verdict by the juror's own testimony, *e.g.*, *Commonwealth v. Patrick*, 206 A.2d 295, 297 (Pa. 1965) (collecting cases), unless the juror alleged that an external factor had improperly influenced the verdict. *E.g.*, *Commonwealth v. Boden*, 486 A.2d 504, 506 (Pa. Super. Ct. 1984). The Pennsylvania Rules of Evidence now provide for the same policy in language nearly identical to the federal rule's. *Compare* PA. R. EVID. 606(b) *with* FED. R. EVID. 606(b). *See* PA. R. EVID. 606(b) cmt. (characterizing FED. R. EVID. 606(b) and PA. R. EVID. 606(b) as "consistent with [existing] Pennsylvania law"). The Supreme Court in *McDonald* explained the importance of the public-policy concerns that underlie the "no impeachment" rule:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many

would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation — to the destruction of all frankness and freedom of discussion and conference.

238 U.S. at 267-68. In *Tanner*, 483 U.S. at 120-21, the Court added:

Allegation of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of process. . . . Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

IV.

A.

With this background in mind, we turn first to the affidavit of Jewel Hayes. As noted, Hayes stated in her affidavit that she had encountered a juror in the lobby of the courthouse after the trial had ended and that the juror had stated that " 'all niggers do is cause trouble' " and that Hayes "should go back [to] where [she] came from." Hayes was not a juror, and although the habeas respondent (hereinafter "the Commonwealth") suggests that Hayes's evidence concerned the "internal workings" of the jury, Appellee's Br. at 18, this is plainly not correct. The incident that Hayes recounted occurred after the trial ended and in a public place; no other jurors were alleged to have been present at the time; and the offensive remarks did not

concern discussions among the jurors or anything that any other juror had purportedly said or done.

No rational justification for the exclusion of this testimony was provided by the state courts or the District Court, and none has been offered in this appeal. Hayes's testimony does not fall within the original version of the "no impeachment" rule. *See Vaise*, 99 Eng. Rep. at 944 ("The Court cannot receive such an affidavit from any of the jurymen themselves . . . but in every such case the Court must derive their knowledge from some other source: such as from some person having seen the transaction through a window, or by some such other means."). Nor does Hayes's testimony fall within the version of the "no impeachment" rule adopted for use in Pennsylvania or the federal courts. *See Commonwealth v. Greevy*, 114 A. 511, 512 (Pa. 1921) ("Public policy forbids the examination of *jurors*, as to the reasons for their verdict") (emphasis added); *Cluggage v. Swann*, 4 Binn. 150, 159 (Pa. 1811) (Yeates, J.) (stating that "the testimony of *jurors* ought not to be admitted to invalidate their verdicts") (emphasis added); PA. R. EVID. 606(b); FED. R. EVID. 606(b). Although Williams relied on Hayes's affidavit in the PCRA Court, the Superior Court, the Pennsylvania Supreme Court, and the District Court, none of these courts explained why Hayes's evidence was inadmissible.

In defending the state courts' treatment of this issue, the Commonwealth notes without elaboration that Williams "did not present Jewell [sic] Hayes' live testimony at the July 18, 1995 hearing,"[4] Appellee's Br. at 7, but we cannot

---

4. Williams asserts that Hayes was available to testify at the post-trial hearing in 1985 but that he was precluded from questioning her because the court did not allow him to attend the hearing and because his attorney was also not present. Appellant's Br. at 22 n.12. Williams also asserts that Hayes was available to testify at another hearing on a different issue in 1987. *Id.* With respect to the 1995 PCRA hearing, Williams does not assert that Hayes was available to testify but instead contends that the court ruled that Hayes's testimony would be inadmissible. *Id.* Based on our review of the transcript of this proceeding, it is not clear to us that the PCRA court so held. During the legal argument that preceded Montgomery's testimony, neither counsel

affirm the decision of the District Court on this ground. When a federal constitutional claim is rejected without explanation, we must presume that the decision was not based on a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 734-35 (1991). If the state courts had refused to consider the evidence in Hayes's affidavit on the ground that the defense failed to produce her live testimony at the PCRA hearing, we would have to determine whether this was an adequate and independent state ground that precluded our consideration of the merits of the federal constitutional claim. But the state courts made no mention of any such procedural bar, and we must therefore proceed on the assumption that Williams's federal constitutional claim, insofar as it was based on Hayes's evidence, was rejected on the merits.

Finally, the Commonwealth's brief argues that Hayes's evidence did not show that the juror in question lied during voir dire. Appellee's Br. at 15. We would be presented with a different question in this appeal if the state courts had made a factual finding that Hayes's testimony was not credible or that the juror in question, despite the comment recounted by Hayes, had answered the pertinent voir dire questions truthfully. In either of those circumstances, we would be compelled to decide whether the state courts' findings were "unreasonable" in light of the state court record. 28 U.S.C. § 2254(d)(2). But the state courts made no such findings. Because they did not do so and also made no mention of a state procedural bar, we must assume that the state courts ruled either that Hayes's testimony was inadmissible or was insufficient, even if believed, to warrant relief. Either holding would represent

---

nor the court mentioned Hayes. The PCRA court ruled that Montgomery could testify as to "extraneous" information but not as to what occurred "in the courtroom, or in the jury room." App. 90a. The court's ruling did not refer to Hayes, and since her affidavit concerned a comment made by a juror in a public corridor, not in the courtroom or the jury room, it is far from clear that the court precluded her testimony. Nevertheless, as noted in text, because the Pennsylvania courts did not rely on a procedural bar, we must assume that they ruled on the merits of Williams's constitutional claim.

an unreasonable application of clearly established federal law. On the facts presented to us, the failure to receive and consider Hayes's testimony for the purpose of determining whether a juror lied during voir dire cannot be sustained under 28 U.S.C. § 2254(d)(1).

## V.

We now consider Montgomery's evidence. Montgomery made two allegations. First, she testified that, after the guilty verdicts were returned but before the jury sentenced the Williams brothers to death, the jurors were told by an alternate that Ronald Williams had been convicted of two other offenses and that his brother was wanted in two other states. Second, she stated in her second affidavit that, "when [she] was Juror No. 9," other jurors made remarks that suggested acute racial bias. App. 6a. We discuss each allegation separately.

### A.

With respect to the first allegation — regarding the jury's receipt of extraneous information after the guilty verdict was returned — we see no ground for holding that Williams is entitled to relief beyond that already awarded by the Pennsylvania Supreme Court. There is no dispute that Montgomery's testimony about outside information received by the jury falls within the "no impeachment" rule's exception. Indeed, the Court of Common Pleas twice permitted Montgomery to testify about such "extraneous" influence, and the Pennsylvania Supreme Court agreed that this testimony was admissible. *See Williams*, 561 A.2d at 719; *Williams*, 522 A.2d at 1067-68. However, because the jurors first received this information "at the sentencing phase," the state supreme court held that the proper remedy was not a new trial but a reduction of the sentence to one of life imprisonment. *Williams*, 561 A.2d at 719; *Williams*, 522 A.2d at 1067 (*citing* 42 Pa. Cons. St. § 9711(h)). We see no basis for holding that anything more is required by the federal Constitution.

B.

1. We thus come to Montgomery's allegation that jurors made racially biased remarks at some point during the trial. Williams first contends the state courts were obligated to consider Montgomery's testimony about these remarks because the "no impeachment" rule simply does not apply when a defendant seeks to introduce evidence to support "a claim of juror misconduct committed during voir dire," Appellant's Br. at 19, but this argument is plainly too broad. If it were correct, a party could call jury members to testify about statements made during actual jury deliberations so long as the purpose for introducing the evidence was to show that a juror had lied during voir dire. However, both the Federal and the Pennsylvania Rules of Evidence categorically bar juror testimony "as to any matter or statement occurring during the course of the jury's deliberations" even if the testimony is not offered to explore the jury's decision-making process in reaching the verdict. Indeed, Rule 606(b) was amended during the legislative process precisely to make it clear that the Rule means what its plain terms state in this regard. *See Tanner*, 483 U.S. at 122-25. Although the question now before us is not whether Montgomery's testimony was prohibited by Federal Rule 606(b) (since Rule 606(b) did not govern the state proceedings) or by the Pennsylvania version of the "no impeachment" rule (since the enforcement of a state rule is a matter for the state courts), the Supreme Court's decision in *Tanner* implies that the Constitution does not require the admission of evidence that falls within Rule 606(b)'s prohibition. *See id.* at 127. And in any event, *Tanner* surely defeats any argument that it is "clearly established" in Supreme Court jurisprudence that the Constitution mandates the admission of such evidence.[5] Thus, if the

---

5. Williams erroneously suggests that our decision in *United States v. Richards*, 241 F.3d 335 (3d Cir. 2001), embraced the principle that the "no impeachment" rule does not apply when evidence is offered to prove juror misconduct. In *Richards*, the defendant moved for a new trial on the ground that the jury foreman was a friend of the government's witness and that the juror had failed to describe their relationship honestly during voir dire. *See id.* at 344. Citing *McDonough*, we held that the District Court did not abuse its discretion in finding, based on its

juror statements to which Montgomery referred occurred during jury deliberations, the state courts did not violate "clearly established Federal law" in refusing to consider those statements.

2. But what if the statements were not made during jury deliberations? As noted, Montgomery's second affidavit did not pin down exactly when or where the alleged statements were made, stating only that they took place "when I was Juror No. 9 in the trial of Commonwealth of Pennsylvania vs. Ronald Williams and Raymond Williams." Suggesting that the comments did not occur during the deliberations, Williams contends that the "no impeachment" rule does not apply to statements made by jurors "before deliberations began and outside the jury room," Appellant's Br. at 20, but this broad argument is wrong. In *Tanner*, the Court held that the "no impeachment" rule barred testimony about juror alcohol and drug use during the trial. 483 U.S. at 116-26. The Court did not accept Justice Marshall's argument in dissent that the rule did not apply to juror conduct that occurred during the trial itself and not during the deliberations, *id.* at 138, 140 (Marshall, J., dissenting), and the Court rejected "a rigid distinction based only on whether the event took place inside or outside the jury room." *Id.* at 117.

But while we reject Williams's argument that location is dispositive, we recognize that a narrower argument could

---

review of the voir dire transcript, that the juror in fact did not withhold any relevant information. The District Court did not receive testimony from any juror in making this determination, however, and so it had no occasion to decide whether to invoke the "no impeachment" rule. *Richards*, therefore, does not support Williams's argument.

Williams also relies on *Hard v. Burlington Northern Railroad*, 812 F.2d 482 (9th Cir. 1987), in which a civil litigant sought to impeach a jury verdict with affidavits by jurors claiming that one juror had misrepresented the nature of his past employment by the defendant. *See id.* at 484, 484 n.1. The District Court refused to admit the affidavits, but the Ninth Circuit reversed, holding that Rule 606(b) does not bar "[s]tatements which tend to show deceit during voir dire." *Id.* at 485. Since the affidavits in *Hard* recounted statements made during jury deliberations, 812 F.2d at 483, it appears that the decision is inconsistent with Federal Rule of Evidence 606(b).

be made in support of the admission of the particular testimony in dispute here. Specifically, if the other jurors' alleged comments did not occur during deliberations and if Montgomery's testimony about those comments were received for the limited purpose of showing that jurors lied during voir dire, it could be argued that her testimony must be allowed by Rule 606(b) because it would not concern either (1) "any matter or statement occurring during the course of the jury's deliberations" or (2) "the effect of anything" upon any juror's decision-making or mental processes in connection with reaching the verdict.

Nevertheless, while we appreciate this argument, we cannot say that "clearly established Federal law, as determined by the Supreme Court of the United States" requires a state to admit such testimony. A state could reasonably believe that such testimony would implicate "the mental processes whereby the jurors arrived at their verdict." *Commonwealth v. Zlatovich*, 269 A.2d 469, 473 (Pa. 1970). After all, important voir dire questions typically focus on matters that may well affect juror's decision-making processes and, therefore, allowing a juror to testify for the purpose of showing that another juror lied during voir dire may not be viewed as much different from permitting an inquiry into the decision-making process itself. In addition, allowing such juror testimony may be thought to create the potential for the very sort of problems that the "no impeachment" rule is designed to prevent, including in particular the post-trial harassment of jurors in the hope that one will recount a remark by a fellow juror that can be construed as evidence that this juror lied during voir dire.

We emphasize that we do not hold that testimony of the type at issue is inadmissible under Rule 606(b) or any other particular version of the "no impeachment" rule. We express no view on those questions. We hold only that the exclusion of such testimony is not irrational and does not contravene or represent an unreasonable application of clearly established federal law.

## C.

Williams's final argument is that Montgomery's testimony should not have been excluded because evidence of racial bias on the part of jurors should be excepted from the "no impeachment" rule. In making this argument, Williams relies chiefly on *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), where a juror allegedly made racist remarks while carpooling to and from the trial. *See id.* at 1113. The actual holding in *Henley* did not concern racial bias.[6] In dictum, however, the court stated that "a powerful case can be made that [the 'no impeachment' rule] is wholly inapplicable to racial bias because, as the Supreme Court has explained, '[a] juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide. . . .'" 238 F.3d at 1120 *(citing Rushen v. Spain*, 464 U.S. 114, 121 n.5 (1983)). Williams urges us to follow *Henley*'s suggestion and hold that the "no impeachment" rule does not apply to Montgomery's testimony because it concerns racial bias on the part of jurors.

There are multiple problems with Williams's argument. First, this argument was never squarely presented to the state courts. While the state courts were certainly aware of the allegation that racist statements had been made by jurors, and while Williams argued that testimony about the statements should have been received, Williams never argued that juror statements evidencing racial bias fall outside the "no impeachment" rule. Indeed, as previously noted, Williams's state-court briefs made little if any effort to grapple with the "no impeachment" rule. Thus, it appears that Williams's current argument is procedurally defaulted. *See* PA. CONS. STAT. ANN. § 9545(b).

Second, even if we reach the merits of Williams's argument, our limited standard of review under 28 U.S.C. § 2254(d)(1) precludes relief. Under that provision, "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the

---

6. The court held that Federal Rule of Evidence 606(b) did not preclude the admission of juror statements not made during deliberations when offered to show that the juror lied during voir dire. *Id.* at 1121.

time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412. The discussion in *Henley* on which Williams relies is dictum in a Court of Appeals opinion that came well after the state-court decisions in Williams's PCRA appeal.

Nor does the Supreme Court's decision in *Rushen*, which *Henley* cited, provide a basis for habeas relief in this case. The statement in *Rushen* on which the Ninth Circuit relied was also dictum and arose in a different context. In *Rushen*, the Supreme Court considered and rejected the argument that a bizarre development during a long criminal trial had resulted in a violation of a defendant's right to an impartial jury. The defendant was tried in state court for murder and other crimes stemming from a prison escape, and during voir dire potential jurors were asked whether they had any experiences with violent crime. *Rushen*, 464 U.S. at 115. Juror Patricia Fagan answered that she had not, but during the trial there was testimony about an informant named Pratt, and Fagan then recalled for the first time that several years earlier Pratt had been convicted of killing a woman who had been one of Fagan's childhood friends. *Id.* at 115-16. Fagan promptly spoke ex parte with the trial judge, who assured her that she could continue to serve so long as the incident did not taint her objectivity. *Id.* at 116. She promised that it would not. *Id.* The parties did not learn of Fagan's private colloquy with the judge until after the trial had concluded and the jury had found the defendant guilty. *Id.*

In a hearing on a defense motion for a new trial, Fagan testified that her recollection of the murder of her friend had not affected her impartiality. *Id.* at 116, 120-21. She also testified that she had told other jurors that she personally knew Pratt's murder victim. *Id.* at 116. The highest state court to consider the issue found that Fagan's conversation with the judge during the trial was harmless beyond a reasonable doubt because the jury's deliberations as a whole were unbiased. *Id.* at 117. However, a federal District Court granted a writ of habeas corpus, and the Court of Appeals affirmed on the ground that an unrecorded ex parte communication between a trial judge and juror can never be harmless. *Id.* In a per curiam

opinion, the Supreme Court reversed, holding that the state courts' findings that the jury deliberations were not biased were entitled to deference and were adequately supported by the record. *Id.* at 120-21.

The statement cited by the Ninth Circuit appears in a footnote concerning the post-trial hearing at which Fagan testified. In the text of its opinion, the Supreme Court wrote: "Juror Fagan never willfully concealed her association with [the murder of her friend], and she repeatedly testified that, upon recollection, the incident did not affect her impartiality." *Id.* In a footnote at the end of this sentence, the Court added:

> A juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide and whether extraneous prejudicial information was improperly brought to the juror's attention. But a juror generally cannot testify about the mental process by which the verdict was arrived.

*Id.* at 121 n.5 (internal citations omitted).

We understand this passage to mean that, although the "no impeachment" rule barred Fagan from testifying as to whether her recollection of the murder of her friend played any role in "the mental process by which the verdict was arrived," that rule did preclude her from testifying as to whether she was impartial (whether she harbored a "mental bias in [a] matter[] unrelated to the specific issue" in the case) and whether extraneous information (her recollection of the murder) was brought to the attention of the other jurors. These statements, which merely restated well-settled law, fall well short of clearly establishing the rule of constitutional law on which Williams's argument here must rest, namely, that a criminal defendant has a federal constitutional right to introduce juror testimony to prove racial bias on the part of jurors irrespective of any restrictions imposed by the "no impeachment" rule.

A leading evidence treatise states that the application of Federal Rule of Evidence 606(b) to evidence of racial bias on the part of jurors is "problematic." 3 MUELLER & KIRKPATRICK, *supra*, § 248 at 69. The treatise goes on to say that

"[a]rguably the rule bars juror testimony or statements on such points" but that "[c]onceivably such proof could be called outside influence." *Id.*

Our role in this case, however, is not to interpret Rule 606(b) or any other version of the "no impeachment" rule but merely to determine whether the state courts contravened or unreasonably applied "clearly established Federal law, as determined by the Supreme Court." Neither *Rushen* nor any other Supreme Court decision clearly establishes that it is unconstitutional for a state to apply a "no impeachment" rule that does not contain an exception for juror testimony about racial bias on the part of jurors. Accordingly, Williams's argument must be rejected.

## VI.

For the reasons set out above, we vacate the order of the District Court and remand for an evidentiary hearing at which Williams has the opportunity to make the showing mandated by *McDonough*.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*